249 P.2d 205

**ANDRUS v. HILL et al.**

No. 7844.

Supreme Court of Idaho.

Oct. 17, 1952.

T. Harold Lee, Rigby, for appellant.

Ben B. Johnson, Preston, for respondent.

Robert E. Smylie, Atty. Gen., amicus curiae.

TAYLOR, Justice.

The appellants commenced this action to obtain a writ of mandate requiring the defendants, as the Board of Trustees of Joint Class A School District No. 93, Bonneville and Bingham Counties, Idaho, to hold an election in each of four previously organized districts which were, along with other previously existing districts, incorporated

198

into reorganized district No. 93, upon its organization in March, 1950. These four districts existing prior to the reorganization were known as Independent School District No. 11, with school plant at Ucon; Independent School District No. 19, at Ammon; Independent School District No. 35, at Lincoln; and Common School District No. 9, at Coltman. Prior to July 16, 1951, there was in operation in former Independent School District No. 11 (Ucon) and in Independent School District No. 19 (Ammon) an elementary school of eight grades and a high school of four grades; in Independent School District No. 35 (Lincoln) there was in operation an elementary school of eight grades; and in Common School District No. 9 (Coltman) an elementary school of eight grades. Besides the high schools at Ammon and Ucon, there was in the reorganized district a high school at Iona (established by a previously existing district). This Iona high school was refused accreditation by the State Board of Education in the spring of 1951. Because of this the defendant trustees determined upon a plan for shifting certain grades and classes from one school to another within the district in order to provide for the attendance of the Iona high school students elsewhere, and (they allege) to provide more equalized educational opportunity, and more economical operation of the schools of the district.

This plan was announced July 16, 1951, to be effective for the school year 1951–52.

Under it the high school grades 10, 11 and 12 were to be discontinued at Ucon and the pupils comprising those grades in that attendance area were to be transported to and attend school at Ammon (9 miles from Ucon); the 7th, 8th and 9th grades at Ammon were to be discontinued and the pupils comprising those grades in that attendance area were to be transported to and attend school at Ucon; the 7th and 8th grades were to be discontinued at Lincoln and the pupils comprising those grades in that attendance area were to be transported to Iona (3 miles); the 7th and 8th grades were to be discontinued at Coltman and the pupils comprising those grades in that attendance area were to be transported to Ucon (3 miles).

Thereafter and in due time petitions properly executed were presented to the Board of Trustees by qualified electors of these four previously existing districts, asking the board for an election in each of the four districts, to determine whether the voters of the respective districts were for or against the discontinuance of the previously existing attendance units. These petitions were denied by the board upon the ground that its action in transferring the grades and pupils as above-mentioned did not constitute the discontinuance of an "attendance unit".

Over appellants' objection, the trial court received and considered evidence, presented by respondents, of the refusal by the State Board of Education to accredit

the Iona High School; its refusal to authorize more than one Smith-Hughes teacher (Ag. teacher) for each high school; the resulting problem confronting the school board and its solution by the adoption of the plan announced; that more equalized educational opportunities were thereby provided for the children of the district; and that a more economical operation of the school system was thereby achieved. These benefits were not admitted by appellants, but deeming them immaterial they offered no rebuttal evidence thereon.

The fundamental issue involved in this case is the determination of what the legislature meant by the term, "attendance unit", as used by it in Chapter 129, S.L.1949, I.C. § 33–522. Obviously, if the legislature intended by that act to afford the electors of these previously existing districts an opportunity to vote upon the discontinuance of the attendance units as proposed by the respondents, then they would be entitled to have the election held regardless of what considerations had moved the board to make the proposed changes. The sole question is, therefore, the interpretation to be placed upon the language of the legislature, and the admission of the evidence objected to was erroneous.

The statutory provision in question is as follows:

"(b) The Board of Trustees of any reorganized school district, except such as have already voted for or issued bonds in such district, or have sold or removed any school house or plant in such district, shall have the power to discontinue operation of any attendance unit situate within the boundaries of the district except as this power is limited in this sub-section:

"1. If five (5) qualified school electors of a previously organized school district, wholly situate within the boundaries of the reorganized district, and which maintained an attendance unit in full operation at the time of the organization of the reorganized district, or maintained an attendance unit in full operation in the school year immediately preceding organization of such reorganized district shall, between June 1st and August 1st of any year, petition the Board of Trustees for an election within such previously organized district on the question of discontinuance of such previously organized district's attendance unit, the Board shall order an election to be held within ten days in such previously organized district and shall submit to the qualified school electors of such district a ballot which contains the following proposals:

"For Discontinuance of Attendance Unit

"Against Discontinuance of Attendance Unit

"If sixty percent of the qualified electors of such previously organized district voting in such election shall vote against discontinuance of such

attendance unit, the Board of Trustees of the Reorganized district shall be without power to discontinue such attendance unit during that school year." Chap. 129, 1949 S.L.

There is involved no question of the plenary power of the legislature to provide for, regulate, control and alter the public schools of the state, within the definition provided by the constitutional provision imposing that duty on the legislature. Idaho Const.Art. 9, § 1. It is not a question of what the legislature may do, but a question of what it has done.

■ There is no legislative definition of "attendance unit". To construe the language of the statute we must consider the background of this legislation and the problem confronting the legislature at the time it spoke. Traditionally, not only in Idaho but throughout most of the states of the Union, the legislature has left the establishment, control and management of the school to the parents and taxpayers in the community which it serves. The local residents organized the school district pursuant to enabling legislation, imposed taxes upon themselves, built their own school house, elected their own trustees and through them managed their own school. It was under these circumstances that the "Little Red School House" became an American institution, the center of community life, and a pillar in the American conception of freedom in education, and in local control of institutions of local concern.

In the American concept, there is no greater right to the supervision of the education of the child than that of the parent. In no other hands could it be safer.

"The American people made a wise choice early in their history by not only creating forty-eight state systems of education, but also by retaining within the community, close to parental observation, the actual direction and control of the educational program. This tradition of community administration is a firmly accepted and deeply rooted policy. (P. 151.) * * *

"The participation not only of parents but of the entire community in our democratic folk-made schools is an outstanding characteristic of the American educational system. (P. 158.) * *

"The degree to which the United States can remain truly democratic against the terrific trend toward centralization in governmental activity depends on the development of self-sufficiency and competence in the administration of local government. The school is one institution that may solve this problem. (P. 159.) * * *

" 'Faith in the local administration of schools is a part of the democratic tradition. It is important that all the people should feel responsible for their government. In no area is it more necessary than in the provision of public education that the thinking, desires,

and ambitions of the people be made effective.' (The Structure and Administration of Education in American Democracy, pp. 41 42.) (P. 173.) * *

"The American public school is historically an extension of the home. Although the legal control of the education function resides in the state, the tradition of local participation in the educational process is so strong that the general procedural pattern in forty-six of the states delegates to the state responsibility for general planning and appraising but places the responsibility for the actual execution of the plan with the community. The assumption of control over the education function by the state is a specific delegation of power by a public act of the citizens to the individual state and even on a state level represents in a large sense a partnership between the parents and the state. This partnership necessitates the active interest and intelligent participation of parents in the educational program. (Pp. 496 497.) * * *

"From the functional point of view it is extremely important not only to maintain the partnership concept between the home and the school but to strengthen actively the parental participation in the educational process. To achieve this purpose democratic control over public education by the community is a protection against the possible misuse of the education func-

tion by the state or national governments or by special voluntary interest groups." (P. 603.) Moehlman, School Administration, Houghton Mifflin Co., 1940.

As our population grew and rural conditions changed, with improved means of transportation, and as some districts increased rapidly in taxable wealth while others remained comparatively static, it appeared desirable to make changes in order to secure more nearly equal educational opportunities to the children in the different districts. The state equalization fund and the county general levies were some of the means employed. It was also thought that larger school districts would be more efficient. In 1921 the legislature provided for annexation and consolidation of existing districts. However, the principle of local self-government was maintained in that under the 1921 law annexation and consolidation were to be accomplished on a purely voluntary basis. That is, such moves were initiated by petition of qualified voters of the existing districts, §§ 32–310 and 32–311, I.C.A., and were required to be submitted to the electors at elections held separately in each district or unit of territory involved, §§ 32–316 and 32–320, I.C.A., so that no existing district, or part thereof, or any unit of territory, could be annexed to or consolidated with any other district without the approval of the voters of such district or territory.

In 1945 there occurred a shortage of teachers in the state. The legislature there-

upon relaxed the requirements for annexation and consolidation, but still retained the voluntary basis. Chap. 15, 28th Session, 1st Ex.Sess.1946. The regular session in 1945, Chapter 191, provided for the creation of a commission to study the public school system of the state, to make findings and recommendations thereon, and report to the governor and the next regular session of the legislature. This commission procured the services of the Peabody College for Teachers at Nashville, Tennessee, to conduct the survey, and made a voluminous report as required. In its report the commission recognized the importance of local management in the school system.

"This pattern of state and local administration of the schools has been developed, with some variations, in practically all of the forty-eight states. The functions of the state are the determination of standards, the provision for financial support, and the promotion of educational leadership; whereas the functions of local school districts are those of planning for school programs on all levels, providing for the efficient operation and management of the schools, and taxing for their financial support. This sharing of responsibility for public education by the state and the local school district has served to keep the schools close to the people, while at the same time it has provided for guidance and direction of the state educational agencies. This pattern permits local initiative and stimulates educational progress." A Report of the Idaho Education Survey Commission, p. 49.

Nevertheless the report recommended the revamping of the state law affecting the organization of school districts to provide a means of effecting the consolidation and merger of the small districts into larger districts on a compulsory or mandatory basis. A Report of the Idaho Education Survey Commission (Peabody Report) pp. 71, 72, 73 and 74.

The legislature accepted this report and adopted its recommendations as to reorganization practically as made. Chap. 111, 1947 S.L. This law required county and school officials throughout the state to reorganize the school districts of the state within the time limited by the statute, and to create the kind and classes of districts described, practically without regard to the wishes of the electors of the existing districts. True, public hearings were provided for on proposals initiated by the county committee, but the final decision following such hearings was left to the county and state committees. The law does provide for an election to be held throughout the proposed reorganized district, but, except in a case where one pre-existing district has a majority of the total number of qualified voters of the proposed new district, a simple majority of all votes cast at the election is sufficient to carry the proposal. In the event one pre-existing district does have

a majority of all of the qualified voters of the proposed new district, then a simple majority of the votes cast in that district, plus a majority of the votes cast in the balance of the territory of the proposed new district, is necessary to carry the proposal. It is evident from this that in a case such as we have here, where a number of districts are to be combined, two or more of the larger districts or centers of population in the area could compel the patrons of a small isolated school district to come in, against their will. If the voters reject the proposal, a revised plan by the county committee is required and a new election must be held thereon.

The compulsory feature, however, culminates in that provision of the statute which provides that in the event any school districts are not reorganized as required by the law, either because no proposals have been made within the time allowed, or because plans were rejected by the voters, then "the County Committee shall * * * organize such districts", and such committee organized districts must be created by order of the Board of County Commissioners "without an election". § 33–513, I.C., amended by Chap. 14, 1949 S.L.

This law created a great deal of confusion and dissatisfaction throughout the state, particularly in small and isolated communities where its operation was deemed contrary to local interests. A number of amendments were enacted in the 1949 session, among which was the amendment to § 33–522, I.C., defining the powers and duties of boards of trustees of the re-organized districts and quoted hereinabove in full.

We have given the traditional and historical background of this legislation, not with the idea of revelling in the domain of policy, which belongs to the legislature, but for the purpose of arriving at the legislative intent. We must assume that this traditional element of local control of the schools was within and a part of the knowledge and thinking of the members of the legislature, and so assuming, we think this background sheds light on what the legislature intended by the 1949 amendment. It was too late to completely restore autonomy to the local districts, if that were considered desirable, because some of the reorganization provided for in 1947 had already become an accomplished fact. So, it was provided that under the conditions enumerated in the amendment the question of discontinuing an attendance unit must be submitted to a vote of the electors of the previously existing district upon the demand of five qualified electors thereof.

As stated, no attempt was made to define "attendance unit", but it is referred to as a unit "in full operation" and as "such previously organized district's" attendance unit. These phrases would indicate that the attendance unit referred to was that which was in full operation at the time or times referred to in the amendment, that is, if the district had in full operation an

elementary school of eight grades, that was its attendance unit. If it had in full operation a high school of four grades, that was another of its attendance units. If the school were a six grade elementary, a three grade junior high, or a three grade senior high, those were attendance units, within the meaning of the act. We have been cited to no ready-made definition of "attendance unit." "Attendance area" is defined as "a geographical and population area that is served by one school." A Report of the Idaho Education Survey Commission (Peabody Report) p. 55; cf. School Administration, Moehlman, 1940, note p. 157. The legislature, of course, could not have had reference to such a term, but its choice of words would indicate that it intended to restore to the people of the attendance area the right to vote on the discontinuance of their attendance unit, as it existed prior to the reorganization.

Any other definition of an "attendance unit" would appear to render the 1949 amendment a sham and a farce. The respondents admit that under their definition they could remove all of the classes or grades from an attendance unit, save one, or all but ten students, without discontinuing the attendance unit. Could they not by the same reasoning conduct an adult class in community singing in the elementary school building and move all the grades elsewhere, without discontinuing the attend-ance unit? A school building is not a school, neither is it an attendance unit. Cf. Robbins v. Joint Class A School District No. 331, 72 Idaho 500, 244 P.2d 1104; United States v. Kunin, D.C.Conn., 59 F.Supp. 506. Our construction of this statute is further confirmed by the amendment added to it by the 1951 session of the legislature as follows:

"* * * provided, however, no attendance unit shall be deprived of its class room unit status as a separate school, or otherwise penalized for its action in maintaining its attendance unit." Laws 1951, c. 247.

Respondents cite Hovenden v. Class A School District No. 411, 71 Idaho 4, 224 P.2d 1080, in support of their contention that the board of trustees may remove grades from an attendance unit without discontinuing same. In that case the 1949 amendment was in no way involved. The election discussed in that case was that required by section 33–714, subsections 9a and 10, I.C., and not the election provided for by the statute herein considered.

The judgment is reversed with directions to grant the writ.

Costs to appellants.

GIVENS, C. J., and PORTER, THOMAS and KEETON, JJ., concur.