537 P.2d 635

**Marba C. THOMPSON, Individually, et al.,
Plaintiffs and Respondents,**

v.

**D. F. ENGELKING, as Superintendent of
Public Instruction, et al., Defend-
ants and Appellants.**

No. 11534.

Supreme Court of Idaho.

May 1, 1975.

Dissenting Opinion May 21, 1975.

Concurring Opinion June 11, 1975.

Rehearing Denied July 24, 1975.

794

W. Anthony Park, Atty. Gen., James R. Hargis, Deputy Atty. Gen., Boise, for defendants and appellants.

1. The taxing system will be explained in the second section of this opinion.

2. Exhibits A through H, which are primarily copies of official reports of the State of Idaho, were submitted to the trial court. Exhibits

John T. Hawley of Hawley, Troxell, Ennis & Hawley, Boise, for plaintiffs and respondents.

McQUADE, Chief Justice.

In this appeal the Court is asked to determine the constitutionality of Idaho's present public elementary and secondary school financing system. The trial court determined that the present system, with its heavy reliance on the ad valorem property tax,[1] violates Art. 9, Sec. 1, of the Idaho Constitution by failing to provide the requisite "uniform system of public schools." The trial court ordered the defendants to restructure the financing system in such a manner as not to violate the constitutional provision. We reverse the judgment of the trial court. We find that the public school financing system of the State of Idaho does not violate Art. 9, Sec. 1, of the Idaho Constitution, nor does it deny plaintiffs-respondents, and those similarly situated, equal protection of the law. Article 9, Section 1, of the Idaho Constitution states:

"The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools."

I.

This case was brought as a class action in the district court and decided on the basis of briefs, oral argument, and stipulated facts.[2] The trial court found: Plaintiffs Marba C. Thompson and Paul S. Thompson are residents, property owners, and taxpayers within Pocatello School District No. 25; plaintiffs Bradley, Annette, Leslie, Leanne, and Stephen Thompson are all minor children of Paul and Marba

K through Q consist for the most part of reports of the state for the school year 1972–73, and have been admitted as a part of the record before this Court pursuant to our order allowing augmentation of the record.

Thompson, and reside in and attend the various schools of Pocatello School District No. 25 (during the 1971-72 school year); the plaintiffs in this class action represent themselves and others similarly situated with that class being all children in the State of Idaho who are attending the free public elementary, junior high and high schools in this state, with the exception of those children in that school district, the identity of which is presently unknown, which affords its students, in the view of the trial court, the greatest educational opportunity of all school districts within Idaho; defendants D. F. Engelking, serving as the State Superintendent of Public Instruction, the individual members of the State Board of Education, State Auditor Joe R. Williams, and State Treasurer Marjorie Moon are parties in their official capacities; the County Auditor, Treasurer, and Assessor of Bannock County, Canyon County, Bingham County, Latah County and Ada County, all of which are counties in the State of Idaho, are parties defendant in their official capacities for their respective counties.

The complaint sought a declaratory judgment that (1) the plaintiffs have been denied equal protection of the laws of the United States and of the State of Idaho, and (2) the school financing system of Idaho is void and without force or effect as repugnant to the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States and to the fundamental law and the Constitution of Idaho. The plaintiffs requested that (1) the defendants be ordered to reallocate the funds available for financial support of the school system and (2) that the court retain jurisdiction to afford defendants and the Legislature a reasonable time in which to reallocate those funds and to otherwise restructure the financing system so as to provide "substantially equal educational opportunities" for all children of the state, as required by the equal protection clauses of the United States and Idaho Constitu-

tions. The trial court found a justiciable controversy in plaintiffs' allegations and defendants' reply asserting the constitutionality of the financing system.

Based upon the trial court's jurisdictional findings and the findings of fact set out in the following section concerning the exact workings of the funding system, the trial court made the following conclusions of law: The class action was properly brought by the plaintiffs; the above listed defendants are proper parties; the court had jurisdiction over both the subject matter and the parties, and, therefore, had the power to determine the constitutionality of the school financing system of the State of Idaho; the State of Idaho, by and through the defendants has the duty under the provisions of Art. 9, Sec. 1, of the Idaho Constitution to establish and maintain a general, uniform and thorough system of public, free common schools for all children in the state, including plaintiff children; the state legislature has the plenary power to provide for, regulate, control and alter the public schools of the state to meet the requirements of Art. 9, Sec. 1 [the trial court citing Andrus v. Hill [3] ]; the constitutional mandate to the state to establish and maintain a general, uniform and thorough system of public schools requires that the system provide an equal educational opportunity to all children attending the public schools in the state.

The trial court concluded that there is a significant connection between the sums expended for education and the quality of the educational opportunity; and therefore, a system of school financing which results in disparity of per student expenditures by the various school districts, cannot meet the so-called constitutional mandate of complete equal educational opportunity. Since it concluded that the above denial resulted from the present system of financing, the trial court found that system unconstitutional and allowed the defendants

3. 73 Idaho 196, 249 P.2d 205 (1952).

until July 1, 1975, to correct the alleged constitutional deprivations.

Finally, the trial court concluded that the public school financing system does not violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution or Art. 1, Sec. 2, of the Idaho Constitution. As authority for that conclusion, the lower court cited San Antonio Independent School District v. Rodriguez[4] and Robinson v. Cahill.[5]

From these conclusions of law, the appellants make the following assignments of error: the trial court erred in finding that the Idaho Constitution requires equal educational opportunity for all students attending public elementary and secondary schools; the trial court erred when it concluded that a connection exists between education expenditures and the quality of the resulting educational opportunity; the trial court erred in its conclusion that a system of finance in which per pupil expenditures vary directly with the amount and value of taxable property within the school district cannot meet the constitutional mandate when the school districts vary widely in concentration of taxable property; the trial court erred when it concluded that under the existing system of public school financing the education opportunity available to a pupil is materially dependent upon the amount and value of the taxable property within the school district in which the pupil resides, and that

the amount and value of such property varies widely among the existing school districts; the trial court erred when it held that the existing financing system does not provide equal educational opportunities to all public school pupils in the state.

## II.

Before turning to the substantive issues of this case, it is necessary to first describe the public school financing system of Idaho. Both the appellants and the respondents have noted the clarity of the description of the system incorporated in the trial court's findings of fact. With this we agree, and borrow heavily from those findings.

Approximately 185,700 children attend public elementary and secondary schools in Idaho. The system is composed of 115 school districts. The funds supporting these public elementary and secondary schools in Idaho are derived from five sources, those being state funds, county property tax, local school district property tax, federal funds, and funds received from miscellaneous sources such as activity fees and lunch programs. In the school year 1970–71, the statewide total expenditures from all funds totaled $123 million. The summary, as stipulated, as to source and percentage therefrom was as follows: state funds—36%; county property tax —7%; local school districts—40%; federal funds—11%; miscellaneous—6%.[6]

---

4. 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

5. 62 N.J. 473, 303 A.2d 273 (1973), cert. denied sub nom., Dickey v. Robinson, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973).

6. The total expenditures for the 1971–72 school year were $136 million, while the 1972–73 school year figure was $147 million. The percentages as to revenue sources for those two years were as follows:

|  | State | County | Local | Federal | Misc. |
|---|---|---|---|---|---|
| 1971–72 | 33% | 6% | 38% | 11% | 12%* |
| 1972–73 | 34% | 7% | 40% | 10% | 9% |

* Due to an unusually high percentage from bond revenue.

The local school districts raise their 40% of the funds through ad valorem taxes levied on the property within their districts. The levies are composed of the General School Levies, Migratory Farm Levy, School Plant Facilities Reserve, School Emergency Fund, Special School Assistance Levy and the Equalization Levy.[7]

Primarily, the education funds from the state are distributed through the Foundation Program.[8] This program is essentially a formula established by the Legislature to distribute available funds in an attempt to equalize the amount of money available per pupil[9] in the various school districts, and contains three distribution components which are the Foundation Education Program, the Foundation Transportation Program and the Foundation Exceptional Education Program. State funds for the Foundation Program are derived from state general fund appropriations, endowment fund earnings, and other miscellaneous revenues under the control of the state legislature.[10]

The formula under which these funds are distributed to the districts may be summarized as follows: multiply the total weighted average daily attendance of the district[11] by the state average cost factor

7. The various levies may be defined as follows:

A. *General School Levies:* There are two types of general school levies.

1. Maintenance and Operation Levy (M&O). This is for current operating expenses paid out of the general fund. School boards can levy up to 27 mills on assessed valuation (not adjusted assessed valuation) for M&O. A levy above 27 mills requires a "voter override" election. At the time this suit was filed the M&O limit was 30 mills. (I.C. § 33–802).

2. Bond Interest and Redemption Levy. This is for paying maturing bonds and interest. Bonded indebtedness is limited to 20% of assessed valuation of a district. (I.C. § 33–1103).

B. *Children of Migratory Farm Workers Levy:* This permits districts to levy 5 mills for the education of the children of migratory farm workers. However, if the districts total M&O levy exceeds 30 mills, including this levy, a voter override election is required. (I.C. § 33–803).

C. *School Plant Facilities Reserve:* A district, with a vote of the electors can levy up to 15 mills for up to ten years for this reserve to pay for future capital costs (I.C. § 33–804, § 33–901).

D. *School Emergency Fund Levy:* Up to 3 additional mills, without a voter override election, may be assessed to pay for an increased number of pupils in the district over the previous year (I.C. § 33–805).

E. *Special School Assistance Levy:* This permits an additional county levy up to 3 mills to assist school districts with assessed valuations of less than $2,500 per pupil. This provision is without practical effect today since no district in the state qualifies. (I.C. § 33–806).

F. *School District Equalization Levy:* School districts in counties which assess property at a lower percentage of market value than the state average are required to levy an additional amount so that the total M&O levy in the district raises an amount equivalent to 22 mills on the adjusted assessed valuation of the district's real property (adjusted assessed valuation is the value of the district if it were assessed at the average percentage of market value for the state as a whole). (I.C. § 33–1016).

8. Idaho Foundation and Transportation Programs, Idaho Code, Title 33, Chap. 10.

9. On an "average daily attendance" basis (A.D.A.): ADA or "pupils in average daily attendance" is computed from the daily school attendance figures for the 28 best weeks of the school year. [I.C. § 33–1001(4)].

10. County (The amount raised by a required county-wide levy of 8 mills on the adjusted valuation of taxable property together with miscellaneous funds in the county school fund. See I.C. §§ 33–904, 33–1009(3)(a), 33–1011, 33–1015.) and school district revenues (the amount which may be raised by a levy of 22 mills on adjusted property valuation in the district. See §§ 33–1002, 33–1016.) included in the Foundation Program are not physically transferred to the state, but are dealt with as credits in the total amount of funds available for distribution to the districts under the Foundation Program formula.

11. *Weighted Average Daily Attendance (WADA):* The average daily attendance (ADA) is weighted to allocate extra funds for the more costly aspects of the school program. The secondary school attendance figures are weighted (multiplied) by 1.3. Sparsity factors are applied to pupils in districts with smaller schools. These factors range from 1.25 for elementary schools with less than 100 ADA to 1.0 for districts with more than 300 elementary ADA. The sec-

per student;[12] subtract from that the product obtained by multiplying the adjusted assessed valuation [13] of the district by 22 mills; add the district allowance for the Foundation Exceptional Education Program (80% of the cost of personnel hired to work with children who require special education and services); and add the Foundation Transportation Program allowance.[14]

The final effect of the Foundation Program is a 22 mill level of taxation that is equalized among the districts. When the mill levy of the districts is combined with the state funds, each district has available essentially the same base amount of funds per ADA. To raise the additional funds deemed necessary, the locally elected trustees of the individual school districts levy taxes against the taxable property within the district. Because of the variation in the assessed valuation per pupil in the Idaho school districts, the amount which the individual districts can raise with each mill levied varies greatly.

In summary, the overall scheme of funding the public schools is in part dependent upon the school district ad valorem property tax. Because of the differences in the assessed valuations of the districts, the amounts raised and spent per pupil varies among the several districts. The trial court found this circumstance to be violative of Art. 9, Sec. 1, of the Idaho Constitution.

## III.

We reject the arguments advanced by the plaintiffs-respondents and the conclusions made by the trial court. To do otherwise would be an unwise and unwarranted entry into the controversial area of public school financing, whereby this Court would convene as a "super-legislature", legislating in a turbulent field of social, economic and political policy. We are especially cognizant that the facts and socio-economic conclusions which respondents presented to the trial court are controversial, sketchy and incomplete. In light of the issues as

ondary sparsity factors range from 1.7 with ADA less than 100 to 1.0 with 750 or greater ADA. The exceptional child sparsity factors range from 1.80 with less than 4 exceptional children ADA to 1.60 for 10 or more exceptional children ADA.

The total of the ADAs multiplied by the various factors results in the WADA.

12. *State Average Cost Factor Per Student:* This is obtained by (1) multiplying the Adjusted Assessed Valuation for all school districts by 22 mills, (2) adding the product obtained by multiplying the Adjusted Assessed Valuation for all counties by 8 mills, (3) adding all state appropriations, endowment earnings, miscellaneous revenue, and county school fund balances, (4) subtracting the Foundation Transportation, and (5) dividing the remainder by the total WADA of all school districts in the state. (I.C. § 33–1002(5)).

The trial court found that this factor " . . . bears no relationship to actual expenditures per pupil but simply fixes the per pupil amount of state controlled funds available for distribution through the formula."

13. *Adjusted Assessed Valuation:* Property taxes in this state are not levied on the full market value of property, but on an arbitrary

percentage of that value called the "assessed valuation." The percentage of market value at which property is assessed (assessment ratio) varied in 1970–71 from 13.4 to 20 in different counties. Because of the variations in the assessment ratios used by the counties, an Adjusted Assessed Valuation is used by the state in calculating the Foundation Formula. The State Tax Commission determines the state average assessment ratio which is divided by the assessment ratio of a county. This factor is multiplied by that county's assessed valuation to obtain the Adjusted Assessed Valuation. For example, if the state average assessment ratio is 15% and a county uses a 10% ratio, the county's assessed valuation would be multiplied by $^{15}/_{10}$, or 1.5, to obtain the Adjusted Assessed Valuation.

14. *Foundation Transporation Program Allowance:* This program is designed to pay part of the costs of pupil transportation. The program pays 90% of the difference of the approved transportation costs of the district less the amount one mill would raise when applied to the adjusted value of the taxable property in the district. (See I.C. § 33–1006).

framed in this appeal, we hold that the present system of financing public education in the State of Idaho does not deny equal protection of the laws as guaranteed by the federal or state constitutions,[15] nor does it violate the mandate of the education article of our state constitution.[16]

Respondents contended below that because unequal amounts were expended per pupil in the several school districts of the state, those students in school districts with low or median expenditures per student were deprived of equal educational opportunities as compared to those students in school districts having high levels of funds expended per student. This, it was alleged, denied plaintiffs, and those similarly situated, equal protection of the laws and denied them of a fundamental right to be educated. As noted earlier, solely upon the basis of documentary evidence and counsels' argument, the trial court made findings of fact and conclusions of law favorable to respondents. The court held the present system of financing public education in Idaho did not provide equal educational opportunities and therefore violated that provision of the Idaho Constitution requiring the Legislature to " * * * establish and maintain a general, uniform and thorough system of public, free common schools."[17] The trial court also concluded that Idaho's system of financing public schools was not violative of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, or of Art. 1, Sec. 2, of the Idaho Constitution.[18]

We agree with the trial court's disposition of respondents' Federal and State equal protection argument, but we hold the trial court erred in its interpretation of the state constitution's education article. We reach this conclusion after a careful analysis of our Constitution, the circumstances surrounding its adoption, and the long line of cases in which this Court has adjudicated questions relating to our system of public schools and to its financing. At the same time, while the trial court was incorrect in its expansive interpretation of Art. 9, Sec. 1 of the Idaho Constitution, we agree that any examination of our public schools and their system of financing must rest upon Article 9 of the Idaho Constitution in its entirety.

Simply stated, the decision of the trial court rests upon the conclusion that money is the basic and overriding criterion for adequate education as was the thesis of Serrano v. Priest.[19] We agree that funds must be supplied to provide for teachers, supportive staff, physical facilities, texts, supplies, transportation, and the myriad of other necessities in today's public educational system. However, we cannot base our conclusions on what exactly is basic education, what is necessary in basic education, and what are so-called "equal educational opportunities" on the findings and conclusions of the trial court as are now before this Court. Assuming, *arguendo,* that the Idaho Constitution requires that our public school students receive equal educational opportunities, we cannot adopt the ultimate conclusion advanced by respondents, i. e., that unless a substantially equal amount of funds are expended per pupil throughout the state, subject only to natural variances such as sparsity of population, students in those districts receiving less than that district with the greatest ex-

---

15. U.S.Const. Amend. 14, and Idaho Const. Art. 1, § 2.

16. Idaho Const. Art. 9, and in particular, § 1.

17. Idaho Const. Art. 9, § 1.

18. Idaho Const. Art. 1, § 2: "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the legislature."

19. 5 Cal.3rd 584, 96 Cal.Rptr. 601, 487 P. 2d 1241 (1971).

penditure per student are denied equal educational opportunities.

The trial court's holding that equal expenditures per student is the overriding criteria in measuring equal educational opportunities is based solely upon documentary evidence. Such need not conclusively bind this Court.[20] This factor must be stressed in light of the considerable debate among educators and commentators respecting the assumption " * * * that the quality of education varies directly with the amount of funds expended on it and that, therefore, the difference in quality between two schools can be determined simplistically by looking at the difference in per-pupil expenditures." [21] Because of this ongoing argument as to the relationship of funds expended per pupil (above a minimum level needed for proper facilities, etc.) to the quality of educational opportunity, we refuse to venture into the realm of social policy under the guise of equal protection of the laws or fundamental right to education. The courts are ill-suited to a task which is the province of the legislature.

The trial court found that the present system of funding public education in Idaho did not violate the equal protection clause of the Fourteenth Amendment of the United States Constitution or that provision's equivalent in the Idaho Constitution, Art. 1, Sec. 2.[22] That holding was based upon the United States Supreme Court's decision in San Antonio Independent School District v. Rodriguez [23] and the rationale of the New Jersey Supreme Court in Robinson v. Cahill.[24] We agree that the *Rodriguez* decision is a final determination of the effect of the federal equal protection clause on the question of public school financing.[25] We also agree that the Idaho system of public education does not deny equal protection under the Idaho Constitution.

In *Rodriguez* the federal supreme court initially applied the recently re-espoused two-tiered "strict scrutiny—compelling state interest" test [26] in deciding whether the Texas system of financing public education, a system akin to the method of supporting public schools in Idaho, was violative of the federal equal protection clause.

---

20. *See* Northshore School District No. 417 v. Kinnear, 84 Wash.2d 685, 530 P.2d 178 (1974).

21. San Antonio Independent School District v. Rodriguez, *supra* n. 4, 411 U.S. at 24, 93 S.Ct. at 1291, 36 L.Ed.2d at 37, n. 56 (1973). *See* Northshore School District No. 417 v. Kinnear, *supra* n. 20, wherein a plurality of the Washington Court found " * * * that assessed valuation per pupil not only has little to do with the quality of education in the enumerated districts, but that no decision as to the equal protection of the laws nor the paramount duty to provide uniform education can be based upon it. The significance of assessed valuation per pupil is thus inconstant, tenuous, superficial and coincidental only." 84 Wash.2d at 707, 530 P.2d at 191. *But see* Robinson v. Cahill, *supra* n. 5, 62 N.J. at 481, 303 A.2d at 277, wherein the New Jersey Supreme Court held: "But it is nonetheless clear that there is a significant connection between the sums expended and the quality of the educational opportunity."

22. See n. 18, *supra*.

23. *Supra*, n. 4.

24. *Supra*, n. 5.

25. *Accord*, Shofstall v. Hollins, 110 Ariz. 88, 515 P.2d 590 (1973) ; Robinson v. Cahill, *supra*, note 5. In Serrano v. Priest, *supra* n. 19, the California Supreme Court held, in a decision rendered before *Rodriguez*, that California's public school financing system, which relied heavily on local real property taxes with resulting substantial disparities among individual school districts in the amount of funds expended per pupil, was discriminatory and violative of the Fourteenth Amendment of the United States Constitution. The California Court held that Art. 1, § 11 and § 21 of the California Constitution were "substantially the equivalent" of the federal equal protection clause and so ruled that their analysis of the federal equal protection argument was also applicable to an analysis of the state equal protection question.

26. See Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

The Court found the Texas system had not been shown to discriminate against any suspect class, i. e., the system had not been shown to discriminate on the basis of wealth. The Court went on to examine the second aspect of the strict scrutiny approach. Did. the Texas school financing system violate a substantive, fundamental constitutional right? The Court held that education is not a fundamental right guaranteed by the United States Constitution, stating that the right to education was not explicitly or implicitly guaranteed by the United States Constitution. Since the Texas system did not violate either of these two criteria, suspect class or fundamental right, Texas was not obliged to show a compelling state interest for the system. Rather, in assessing the system under the lesser rational basis test, the Court held that the Texas plan rationally furthered a legitimate state interest.[27]

* The argument is advanced that under the strict scrutiny-compelling state interest test used by the United States Supreme Court in *Rodriguez*, our system of public school financing violates the equal protection clause of the Idaho Constitution. Its proponents contend that there exists in Idaho a *substantive fundamental* right to education, based upon Art. 9, Sec. 1 of the Idaho Constitution.[28] They follow with the contention that because of the variances between school districts in the amount expended per pupil, resulting in allegedly unequal educational opportunities for those students in districts receiving less than the maximum amount per capita, the fundamental right to education of those students in the districts expending less than the maximum amount per student is violated and their right to equal protection of the laws is denied, since the state cannot show a compelling interest for the disparity in amounts expended per district per student. This argument must be rejected for several reasons.

First, we must determine the proper application of the Idaho equal protection clause. In Caesar v. Williams,[29] this Court without attempting to fully define the meaning of the Idaho Equal Protection Clause held that the clause forbids state discrimination that reflects no rational policy, but which is simply arbitrary and capricious action. The *Caesar* holding reflects the traditional "rational basis" test which was the standard finally used by the United States Supreme Court in *Rodriguez* to determine the constitutionality of the

---

27. In so holding, Mr. Justice Powell, speaking for the majority, wrote: "Texas has acknowledged its shortcomings and has persistently endeavored—not without some success—to ameliorate the differences in levels of expenditures without sacrificing the benefits of local participation. The Texas plan is not the result of hurried, ill-conceived legislation. It certainly is not the product of purposeful discrimination against any group or class. On the contrary, it is rooted in decades of experience in Texas and elsewhere, and in major part is the product of responsible studies by qualified people. In giving substance to the presumption of validity to which the Texas system is entitled, . . . it is important to remember that at every stage of its development it has constituted a 'rough accommodation' of interests in an effort to arrive at practical and workable solutions. . . . One also must remember that the system here challenged is not particular to Texas or to any other State. *In its essential characteristics, the Texas plan for financing public education*

reflects what many educators for a half century have thought was an enlightened approach to a problem for which there is no perfect solution. We are unwilling to assume for ourselves a level of wisdom superior to that of legislators, scholars, and educational authorities in 50 states, especially where the alternatives proposed are only recently conceived and nowhere yet tested." [Footnotes omitted. Emphasis added.] 411 U.S. at 55, 93 S.Ct. at 1308, 36 L.Ed.2d at 56–56.

28. Idaho Const. Art. 9, § 1: "The stability of a republican form of government depending mainly upon the intelligence of the people, *it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools.*" [Emphasis added.]

29. 84 Idaho 254, 371 P.2d 241 (1962). The Court held that " * * * equal protection is subject to all limitations inherent in the Constitution itself, and valid enactments of the legislature." 84 Idaho at 268, 371 P.2d at 249.

Texas school financing system. In Weller v. Hopper,[30] this Court held that a retail liquor licensing statute forbidding the licensing of one whose license had been revoked for a felony conviction denied equal protection of the laws in violation of *both* the United States Constitution and the Idaho Constitution, since the Court concluded that the attempted classification was unreasonable, arbitrary and discriminatory.

In State v. Cantrell,[31] the Court was faced with an equal protection attack on statutes dealing with the regulation of retail sales of liquor, requiring, with certain exceptions, that establishments so engaged be located within an incorporated city. In discussing the equal protection requirements of *both* the federal and state constitutions, the Court held that a discriminatory classification must reflect a reasonably conceivable, legitimate public purpose and must reasonably relate to that purpose. The Court went on to say that in respect to the police power at least, the legislature " * * * must be free to remedy parts of a problem, or to recognize degrees of a problem and to formulate solutions in the areas it determines to be more in need or more readily corrected than others. . . . [T]o require either that the legislature remedy at once all aspects of a particular problem or that it do nothing would *emasculate the plenary power expressly granted by the state constitution.*"[32] Not only is the legislature granted plenary power in the exercise of the police power, but also in the field of public education. Electors of Big Butte Area v. State Board of Education.[33] In *Cantrell,* the Court mentions by way of footnote the more rigorous "compelling state interest" test, which, it notes, has been applied by some appellate courts to cases of "suspect" classifications based on race, national origin and alienage, or to infringements of "fundamental interests" such as voting, procreation and rights respecting criminal procedure.[34]

In holding the Idaho motor vehicle guest statute unconstitutional as an impermissible classificatory scheme violative of the equal protection clauses of *both* the federal and state constitutions, this Court again used the rational basis test to determine that the statutory scheme which discriminated against any negligence cause of action brought by a motor vehicle guest bore no rational relationship to the objectives sought to be advanced by the legislature through the guest statute. Thompson v. Hagen.[35] In *Thompson,* the Court mentioned the two-tiered analysis followed by the United States Supreme Court wherein discrimination involving suspect classifications or fundamental rights are judged under the "strict scrutiny" test.[36]

We believe this to be an inappropriate occasion to adopt for use by this Court in interpreting the Idaho equal protection clause, the two-tiered strict-scrutiny test used by the United States Supreme Court to initially scrutinize *Rodriguez,* and applied in other decisions such as Shapiro v. Thompson,[37] and as mentioned by way of *dicta* in *Cantrell* and *Thompson.* Nor, are we inclined to now adopt, so as to dispose of this appeal, the definition of "fundamental right" as set forth in *Rodriguez,* i. e., a right explicitly or implicitly guaranteed by the Constitution.[38] In *Cantrell* and

30. 85 Idaho 386, 379 P.2d 792 (1963).

31. 94 Idaho 653, 496 P.2d 276 (1972).

32. 94 Idaho at 656, 496 P.2d at 279. Footnote omitted. Emphasis added.

33. 78 Idaho 602, 308 P.2d 225 (1957). *Accord,* Andrus v. Hill, *supra* n. 3, In re Common School Districts Nos. 18 & 21, 52 Idaho 363, 15 P.2d 732 (1932). *See* Fenton v. Board of County Commissioners, 20 Idaho 392, 119 P. 41 (1911).

34. N. 9, 94 Idaho at 655–56, 496 P.2d at 278–79.

35. 96 Idaho 19, 523 P.2d 1365 (1974).

36. 96 Idaho at 21, 523 P.2d at 1367.

37. *Supra,* n. 26.

38. *Supra,* n. 4, 411 U.S. at 33–34, 93 S.Ct. at 1297, 36 L.Ed.2d at 43. *See* Northshore School District No. 417 v. Kinnear, *supra* n. 20; Robinson v. Cahill, *supra* n. 5. *But see* Serrano v. Priest, *supra* n. 19.

*Thompson* this Court did not expressly adopt the strict scrutiny test. Also, in *Caesar,* in *Weller,* in *Cantrell* and in *Thompson* the Court analyzed those decisions in light of both the equal protection clause of the Fourteenth Amendment of the United States Constitution and of the equal protection clause of the Idaho Constitution. In those cases the Court used the rational relationship test as the basis for its determination. In the instant case we are dealing solely with an equal protection challenge to a statutory financing scheme under the Idaho Constitution.

█ In past cases the Court has interpreted the equal protection clause of the Idaho Constitution as being susbtantially equivalent to the federal clause. But, it is clear that this Court could reach a result in interpreting the Idaho equal protection clause differing from an interpretation of the federal equal protection clause.[39] For these reasons we refuse to use the "strict scrutiny" test, encumbered as it is with serious problems, to determine if our system of public school financing violates the Idaho equal protection clause. The prudent and correct path is to continue with an analysis of the equal protection argument along the traditional lines of the rational basis test. Using such an analysis, we find that the Legislature, acting in its plenary capacity to establish and maintain a system of public education, has acted rationally and without unconstitutional discrimination in setting up a system of financing, wherein a large portion of revenues for the public schools are levied and raised by and for the local school districts. This Court has recognized the validity of that policy:

> "Traditionally, not only in Idaho but throughout most of the states of the Union, the legislature has left the establishment, control and management of the school to the parents and taxpayers in the community which it serves. The local

residents organized the school district pursuant to enabling legislation, imposed taxes upon themselves, built their own school house, elected their own trustees and through them managed their own school. It was under these circumstances that the 'Little Red School House' became an American institution, the center of community life, and a pillar in the American conception of freedom in education, and in local control of institutions of local concern. In the American concept, there is no greater right to the supervision of the education of the child than that of the parent. In no other hands could it be safer.

> 'The American people made a wise choice early in their history by not only creating forty-eight state system of education, but also by retaining within the community, close to parental observation, the actual direction and control of the educational program. This tradition of community administration is a firmly accepted and deeply rooted policy.'" Andrus v. Hill.[40]

## IV.

█ But, for the sake of argument, let us for a moment adopt the contention that the Idaho system of public school financing is subject to analysis under the two-tiered "strict scrutiny—compelling state interest" test to determine if the Idaho equal protection clause has been violated. To qualify for analysis under the strict scrutiny test, the challenged statutory scheme must discriminate against a *suspect* class or infringe upon a fundamental constitutional right. The majority in *Rodriguez* dismissed the notion of suspect classification based upon wealth, finding an " . . . absence of any evidence that the financing system discriminates against any definable category of 'poor' people or that it results in the ab-

---

39. *See* Robinson v. Cahill, supra n. 5. *But cf.* Northshore School District No. 417 v. Kinnear, *supra* n. 20; Serrano v. Priest, *supra* n. 19.

40. *Supra* n. 3, 73 Idaho at 200, 249 P.2d at 207. *See generally* Hanson v. DeCoursey, 66 Idaho 631, 166 P.2d 261 (1946).

solute deprivation of education . . ."[41] The high court also rejected plaintiffs' argument that because inequities existed in the taxable wealth of the various school districts, there resulted an impermissible discrimination against those situated in the less affluent districts. We agree.[42]

The next step is to examine the scheme for an *infringement of a fundamental constitutional right.* In *Rodriguez*, the United States Supreme Court held that a fundamental right exists only where such right is explicitly or implicitly guaranteed by the United States Constitution. The argument is advanced in the instant case that Art. 9 of the Idaho Constitution expressly guarantees a right to education, and establishes said guarantee as a "fundamental" constitutional right to be analyzed under the "strict scrutiny" test.

We agree with the analysis presented by the New Jersey Supreme Court, cautioning against the categorizing of "fundamental" versus "non-fundamental" rights:

"But we have not found helpful the concept of a 'fundamental' right. No one has successfully defined the term for this purpose. Even the proposition discussed in *Rodriguez*, that a right is 'fundamental' if it is explicitly or implicitly guaranteed in the Constitution, is immediately vulnerable, for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment. And if a right is somehow found to be 'fundamental,' there remains the question as to what State interest is 'compelling' and there, too, we find little, if any, light. Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay con-

sideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial." Robinson v. Cahill.[43]

We also find merit in the warning sounded by several courts which have examined the question of local taxation for raising public education revenue, that in holding those schemes unconstitutionally violative of equal protection, similar provisions for the support of other necessary governmental services normally provided by local governmental entities which are customarily financed to a substantial degree by local property taxes might be subjected to the same fate. Those services include local police and fire protection, support of the local judiciary, roads and many others. In *Rodriguez,* the majority per Mr. Justice Powell, cautioned:

"Moreover, if local taxation for local expenditures were an unconstitutional method of providing for education then it might be equally impermissible means of providing other necessary services customarily financed largely from local property taxes, including local police and fire protection, public health and hospitals, and public utility facilities of various kinds. We perceive no justification for such severe denigration of local property taxation and control as would follow from appellees' contentions. It has simply never been within the constitutional prerogative of this Court to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon

---

41. *Supra*, n. 4, 411 U.S. at 25, 93 S.Ct. at 1292, 32 L.Ed.2d at 38.

42. *Accord*, Robinson v. Cahill, *supra*, n. 5; Northshore School District No. 417 v. Kin-

near, *supra*, n. 20; *Contra*, Serrano v. Priest, *supra*, n. 19.

43. *Supra*, n. 5, 62 N.J. at 491–92, 303 A.2d at 282. See also 62 N.J. at 494 and 303 A.2d at 283–284.

the relative wealth of the political subdivision in which citizens live." [44]

For these reasons, we refuse to classify the right to education as a fundamental right which compels the State, for the purposes of financing, to wipe out local entities and finance on the basis of revenues raised by some sort of statewide system.

## V.

■ Art. 9, and in particular, Sec. 1, does not guarantee to the children of this state a right to be educated in such a manner that *all* services and facilities are equal throughout the State. Such a centralized system of education is not required by our Constitution. Our position is supported by an analysis of the circumstances surrounding the adoption of our constitution, its language, subsequent legislative and judicial history in connection with the education article, and ample, although conflicting, authority from appellate courts of other states that have dealt with this issue.

Statements made by several of the delegates to the state constitutional convention during that body's discussion of the education article demonstrate that the delegates were greatly concerned with public education and felt the need to provide for a continuing system of public education for the children of the state. Some of those remarks indicate a great concern over the manner of financing public education, together with a natural aversion for raising school revenues by taxation. Delegate (later Senator) McConnell stated, while debating the appropriate means to protect the funds expected to be raised from the sale or leasing of lands to be received from the federal government for public school purposes:

"Mr. Chairman, I think no fund is more sacred than the school fund, and perhaps there is no other fund so sacred; it should be guarded in every manner possible, and by having this provision in here, the children will always be made sure there will be that much money to their credit, and we will have that much at stake in our schools. But if there is no provision for making this fund good in every way; it may be squandered, and the first thing we know our school fund will be so small that we can only maintain the schools by local taxation." [45]

After carefully examining these statements, we conclude that the delegates were actually concerned with excessive *direct* taxation of the citizenry to support public education and not with an absolute prohibition on the raising of school revenues by *local* taxation. As Delegate Parker remarked during that same discussion on the school lands:

"Let us hold on to them, and as our territory develops these lands will increase in value and we shall be able to get money for school purposes without calling upon the people for direct taxation for money for educational purposes, . . . ." [46]

The proclamation of the territorial governor calling for the convention, lists as one advantage of statehood: "When these school lands shall have been sold in accordance with existing laws, our school taxes will be reduced to an inconsiderable rate." [47] The history of our constitutional convention does not support the conclusion that the delegates were opposed to local taxation for raising the necessary revenue for local public schools.

■ Furthermore, an examination of those debates fails to support the trial

---

44. San Antonio Independent School District v. Rodriguez, *supra*, n. 4, 411 U.S. at 54, 93 S.Ct. at 1307–08, 36 L.Ed.2d at 55. Cited in Robinson v. Cahill, *supra*, n. 5, 62 N.J. at 489, 303 A.2d at 281; Shofstall v. Hollins, *supra*, n. 25, 110 Ariz. at 91, 515 P.2d at 593.

45. 1 Proceedings of the Idaho Constitutional Convention of 1889 (Hart ed. 1912) at 647 (Hereinafter "Constitutional Proceedings").

46. *Id.* at 650.

47. Proclamation of Governor George L. Shoup calling for the Constitutional Convention, May 11, 1889, 1 Constitutional Proceedings, p. VI.

court's conclusion that the education article requires a public education system wherein equal amounts are expended per pupil on a statewide basis. Stated simply, Art. 9, Sec. 1, is a mandate to the State through the Legislature to set up a complete and uniform system of public education for Idaho elementary and secondary school students.[48] Art. 9, Sec. 1, reads: "[*I*]*t shall be the duty* of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools." (Emphasis added.) On its face, this section mandates action by the Legislature. It does not establish education as a basic fundamental right. Nor, does it dictate a central state system of equal expenditures per student. As Delegate Parker remarked during debate on the proposed educational article:

"The *duty* of the state, Mr. President, is simply *the teaching of the children of the community* the three R's—to learn to read, to write, and the rules of arithmetic, and *the duty of the state* ends right there. . . ."[49]

But today, Parker's statement cannot be given its literal meaning. There is, at least in the context of our present society, more inherent in a thorough system of education than instruction in the three "R's". The constitution gives the Legislature plenary responsibility and duty to establish and maintain a uniform and thorough statewide system of education. It did not require that system be in all ways equal throughout the state, nor did it give to individuals a fundamental right to completely equal educational expenditures.[50]

At its first session following Idaho's entry into the Union, the Legislature passed an "Act to Establish and Maintain A System of Free [Public] Schools."[51] In part the act provided:

"For the purpose of establishing and maintaining public schools in the several counties of the State, the board of county commissioners of each county shall, at the time of levying the taxes for State and county purposes, levy a tax of not less than five mills nor more than ten mills on each dollar of taxable property in their respective counties for school purposes."[52]

\* \* \* \* \* \*

The county superintendent . . . shall proceed to apportion the public school moneys, both county and State . . . among the several school districts, in the following manner, to wit: One-half of the whole amount he shall divide equally among the several districts that have complied with the provisions of this act; the remaining one-half of said whole amount he shall apportion per capita among the several districts in proportion to the number of children in each district, . . . *Provided*, That each district is entitled to one share in the apportionment of the first one-half, regardless of the number of children therein . . . ."[53]

This legislation clearly shows the intent of our first legislators, less than two years

---

48. *See generally* Paulson v. Minidoka County School District, 93 Idaho 469, 463 P. 2d 935 (1970).

49. 1 Constitutional Proceedings at 695 (Emphasis added).

50. It should also be pointed out that the education article, setting forth the responsibilities of the state in regard to public education and establishing a fund to finance a portion of that system, is on a different plane' than is, for example, Art. 1 of the Idaho Constitution, wherein the framers set forth fundamental rights guaranteed to the people by that constitution.

51. Idaho Session Laws, 1st Session, 1890–91, p. 131 et seq.

52. *Id.*, § 20, p. 136.

53. *Id.*, § 22, p. 137. *Infra*, at § 33, p. 142, the act further provided that electors of a regular school district could decide ". . . upon the question of whether or not any special tax shall be levied for any purpose, such as building or repairing school houses, or for the support of public schools in the district; . . ."

after the drafting of the state constitution, to finance public education partially with State funds and partially with funds raised by direct taxation levied by the counties and the several school districts. It also demonstrates the intention that funds from various revenue sources need not be appropriated equally on a per student basis, and that the people of the various counties, through the action of their respective board of commissioners, and of the various school districts by ballot, might levy property taxes unequal between the several districts and between the several counties to finance the local public schools. Since that first enactment, the statutory scheme for the financing of public education has been revised many times. Yet, public education in this State continues to be supported by state and local funds, with the local contribution based upon a system of real property taxation measured and assessed upon the local level.

Many times since the adoption of the Idaho Constitution, the judiciary has been called upon to adjudicate disputes touching upon the meaning of the education article and upon the financing of public education. In interpreting Art. 9, Sec. 1, of the Idaho

Constitution, this Court has repeatedly held that the Legislature has the primary and fundamental *duty* to establish and maintain a system of public education. American National Bank v. Joint Independent School Dist.[54] To fulfill that duty the Legislature has provided general laws for education and left the day-to-day control of the schools at the local level. As noted earlier, this pattern, followed throughout the Union, has repeatedly been approved of by this Court. Andrus v. Hill.[55] In *Andrus*, the Court noted that as the state's population grew, accompanying by a trend towards urbanization of the population, ". . . . and as some districts increased rapidly in taxable wealth while others remained comparatively static, *it appeared desirable to make changes in order to secure more nearly equal educational opportunities to the children in the different districts.* The state equalization fund and the county general levies were some of the means employed." [56] We therein recognized that the Legislature had seen fit to attempt through the use of state foundation funds and general county school levies to more nearly equalize the disparity that existed between the districts in per pupil expenditures.[57]

54. 61 Idaho 405, 411, 102 P.2d 826, 828 (1940): "[T]he duty of maintaining the public schools is imposed by the constitution as a primary and fundamental duty of state government; [Sec. 1, Art. 9, Const.] *Accord*, Electors of Big Butte Area v. State Board of Ed., *supra* n. 33; Fenton v. Board of County Commissioners, *supra* n. 33.

55. *Supra*, n. 3. *In Andrus*, the Court quoted from "A Report of the Idaho Education Survey Commission (Peabody Report)" p. 49, found in 73 Idaho at 202, 249 P.2d at 208–09.
"The functions of the state are the determination of standards, the provision for financial support, and the promotion of educational leadership; whereas the functions of local school districts are those of planning for school programs on all levels, providing for the efficient operation and management of the schools, and taxing for their financial support. This sharing of responsibility for public education by the state and the local school district has served to keep the schools close to the people, while at the same time it has pro-

vided for guidance and direction of the state educational agencies. This pattern permits local initiative and stimulates educational progress."

56. *Supra* n. 3. 73 Idaho at 201, 249 P.2d at 208.

57. *See* Hansen v. DeCoursey, *supra* n. 40. In *Hansen*, the Court was asked to rule upon a statute which empowered the county commissioners to levy a county-wide tax above and beyond the tax of the local school districts to be used to provide additional pay for teachers. In approving the statute, the Court held:
"This clearly leaves the management and control of the schools to the county and the districts, as has been policy throughout the state's history. The legislature in the case at bar has merely made it possible for the more needy schools of the county to obtain help from the whole county, if such assistance is necessary, in the judgment of the county superintendent of schools and the commissioners . . . Thus it leaves the common school subject to local control,

However, while *Andrus* and similar cases recognize the need for subsidies to districts with low tax bases, and approve of the Legislature's attempt to provide that assistance, we do not interpret them to say that Art. 9, Sec. 1 grants a fundamental right to education, whereby in keeping with some nebulous conceptualization of equal educational opportunities, the Legislature is obligated to establish a statewide system of financing so that each school district receives sufficient funds so that equal sums are expended per student throughout the state.[58]

Idaho has long utilized local taxation for support of the public common schools. In Fenton v. Board of County Commissioners,[59] this Court was asked to rule on the constitutionality of a statute, whereby the county commissioners were directed to levy a county-wide tax on real property of not less than 5 mills and no more than 10 mills per dollar of assessed valuation for support of the public schools.[60] In holding the statute constitutional, this Court remarked:

"Schools cannot be established or maintained without revenue, and there is no inhibition in the Constitution on the Legislature from delegating the authority to raise revenue for that purpose to proper local officers.

\*　\*　\*　\*　\*　\*

If, under said provisions of the Constitution, the Legislature has by general law made provisions for the government and support of the common schools by providing suitable machinery and committing the details of its operation to local officers, they then have complied with the provisions of said section 1 of article 9 of the Constitution. The Legislature might delegate the exclusive authority to the board of trustees of each district to levy the taxes for school purposes within its district, but the Legislature has not done so. However, each district may levy a special tax, and the board of commissioners is authorized to levy (a tax) . . . to be apportioned among the districts as provided by law.

It was well known that there were school districts in the state containing a small amount of taxable property and that it would be impossible without classification to raise a sufficient amount of money by taxation on such property to maintain the school in such district for the time required by law; and the method adopted by the Legislature in requiring the several boards of commissioners to levy a tax . . . for public school purposes and to divide it among the districts . . . would assist the weaker districts, and thus enable them to give the children in such districts the required amount of schooling per year." [61]

■■■ Idaho precedent does not support respondents' arguments or the trial court's conclusions. In fact, prior judicial authority sustains the contrary viewpoint. Unequal amounts can be expended per pupil among the several districts depending on the tax base of the respective districts. But, on the other hand, our analysis does not lead to the conclusion that school programs and their financing are to be left to

and, for the purposes of the emergency, the Act presents a plan for raising additional funds for payment of teachers' salaries without interfering with local management of the schools.

\*　\*　\*　\*　\*

Considering the policy of our state constitution towards education (Art. 9, sec. 1) and our policy to leave the common schools under local control, it would seem that the Act before us offers a very wise method of obtaining additional funds for the needy school." 66 Idaho at 635–36, 166 P.2d at 262–63.

58. *See* Fenton v. Board of County Commissioners, *supra*, n. 33. *See generally* Independent School District v. Common School District, 64 Idaho 303, 131 P.2d 786 (1942).

59. *Supra*, n. 33.

60. The statute in question was similar to portions of the act providing for the establishment of a public school passed by the First Session of the Legislature. See *supra* at 22.

61. 20 Idaho at 403–04, 119 P. at 45. *See* Northern Pac. R. Co. v. Shoshone Co., 63 Idaho 46, 116 P.2d 225 (1941).

the complete discretion of local authorities. That, too, would be contrary to the constitutional mandate to the Legislature to maintain and establish a system of public education. Our analysis of the education article of the Idaho Constitution is supported by the great weight of authority from the courts of other states which have interpreted provisions in their respective state constitutions similar to Art. 9, Sec. 1. Yet, we acknowledge that judicial authority can be cited to support respondents' contentions.

Robinson v. Cahill [62] is such a case reaching a conclusion contrary to what we hold is a proper disposition of this appeal. In *Robinson*, the New Jersey Supreme Court rejected the claim that the New Jersey system of financing public education, which relied heavily upon local real property taxation, violated the equal protection clauses of the United States and New Jersey constitutions. However, in interpreting that section of the New Jersey constitution which required the state to provide "a thorough and efficient system of free public schools for the instruction of all children in this State . . ." the New Jersey court concluded that phrase required equal education opportunities for all children and proceeded to measure equality of opportunity upon the basis of statewide equality of expenditures per student. We decline to accept the conclusions adopted in *Robinson* for the reasons stated in this opinion. We point out (1) the controversy that exists concerning the relationship of funds expended per pupil and the equality of educational opportunity, and (2) that Idaho precedent, dealing with the responsibilities and *duties* of the various levels of government in our own educational system, requires a different conclusion from that reached by the New Jersey court in analyzing their constitution adopted in 1947.

In Serrano v. Priest,[63] the California Supreme Court accepted plaintiffs' equal protection argument. However, the court rejected plaintiffs' contention that the California system of school financing violated Art. IX, § 5, of the California Constitution which reads in pertinent part: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year . . . ." The court stated: "[W]e have never interpreted the constitutional provision to require equal school spending; we have ruled only that the education system must be uniform in terms of the prescribed course of study and educational progression from grade to grade." [64] Similarly, the Arizona Supreme Court, in Shofstall v. Hollins,[65] was called upon to interpret those sections of the Arizona Constitution mandating "a general uniform public school system . . ." (art. XI, § 1) and "a system of common schools by which a free school shall be established . . ." (art. XI, § 6). That court held the Arizona constitution established education as a fundamental right. However, while finding the right to a *basic* education, the Arizona high court upheld the Arizona system of financing public education:

"A school financing system which meets the educational mandates of our constitution, i. e., uniform, free, available to all persons aged six to twenty-one, and open a minimum of six months per year, need otherwise be only rational, reasonable and neither discriminatory nor capricious.

A school financing system which has a rational and reasonable basis and which meets the educational mandate of our constitution should, unless otherwise discriminatory or capricious, be upheld." [66]

---

62. *Supra*, n. 5.

63. *Supra*, n. 19.

64. 5 Cal.3d at 596, 96 Cal.Rptr. at 609, 487 P.2d at 1249 (Citation omitted).

65. *Supra*, n. 25.

66. 110 Arizona at 88, 515 P.2d at 592–93.

In Northshore School District No. 417 v. Kinnear,[67] the Washington Supreme Court refused to invalidate the Washington system of public school financing, which also has as one of its major bases, the local real property tax. The court rejected plaintiffs' equal protection arguments and also their contentions that the present system violates various provisions of the state constitution relating to public education. According to the plurality opinion, Art. 9, Sec. 1, of the Washington Constitution, which declares it to be "the paramount duty of the state to make ample provision for the education of all children," imposes a direct duty upon the state to provide an adequate system of public education, the nature and extent of that duty and the means for carrying the duty out, resting with the Legislature and the state superintendent of public instruction.

> "Thus, it is the legislature and the state superintendent upon whom the constitution and statutes impose the responsibility of discharging the paramount duty of the state (1) to make ample provision for the education of all children; (2) to prescribe and enforce the minimal standards necessary to constitute ample provision; and (3) to allocate state equalization funds however they may be described so that every child has access to a 'general and uniform system of public schools' without 'distinction or preference on account of race, color, caste, or sex.' "[68]

The plurality opinion rejected plaintiffs' allegations that the Legislature had failed, by using the present financing system, to establish a "general and uniform system of public schools" in accord with Art. 9, Sec. 2, of the Washington Constitution. That the various school districts varied in size and tax base, they held, did not necessitate a finding that the Washington system of public education was neither general nor uniform.

> That the public schools are partly funded with local property taxes does not deprive the system, we think, of those constitutional qualities described as general and uniform—for it is the *system* which must be kept general and uniform under that provision and not the 320 districts. A *general and uniform system,* that is, a system which, within reasonable constitutional limits of equality, makes ample provision for the education of all children, cannot be based upon exact equality of funding per child because it takes more money in some districts per child to provide about the same level of educational opportunity than it does in others. Thus, the record shows that all states of the Union, except Hawaii, recognize that taxable property values per pupil vary among the districts because expenditures per pupil vary, too. Uniformity of size and property values among school districts is not . . . essential, we think, to a general and uniform system.

> \* \* \* \* \* \*

> A general and uniform system, we think, is, at the present time, one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the 12th grade—a system administered with that degree of uniformity which enables a child to transfer from one district to another within the same grade without substantial loss of credit or standing and with access by each student of whatever grade to acquire those skills and training that are reasonably understood to be fundamental and basic to a sound education . . ."[69]

67. *Supra,* n. 20.

68. 84 Wash.2d at 719, 530 P.2d at 197–98.

69. 84 Wash 2d at 727, 530 P.2d at 202. But see Rosellini, J., concurring in the result:

"I do not . . . concur in those portions of the opinion which would seem to suggest that the State is now providing 'ample' education for all students. There is too much public opinion to the contrary and too many

For all of the above reasons, we refuse to overturn the present system used in this state to finance public education. Neither equal protection, nor Art. 9, Sec. 1, of the Idaho Constitution, require that the public schools be financed so that equal amounts are expended per pupil, subject only to such variables as geographic or demographic location.

In conclusion, we reject the arguments raised by respondents. We hold that the trial court erroneously interpreted the mandate of Art. 9, Sec. 1 of the Idaho Constitution. The record does not demonstrate a failure by the Legislature to comply with its mandate to establish a system of basic, thorough and uniform education; nor, does that record demonstrate an inadequacy of funding to maintain that system of education. Therefore, the decision of the trial court is reversed.

Costs to appellants.

McFADDEN and SHEPARD, JJ., concur.

SHEPARD, J., concurs specially with opinion in which McFADDEN, J., concurs.

DONALDSON and BAKES, JJ., dissent.

SHEPARD, Justice (special concurrence).

I concur in the result reached by the majority opinion. I agree that *Rodriguez* is dispositive of the federal equal protection clause argument, and further agree with the majority's conclusion regarding the state equal protection clause.

The essence of the dissent in this case is that the state equal protection clause does not itself "generate substantive rights" but rather serves as an enforcer of rights delineated elsewhere. Since the express guarantee of a uniform education is delineated in the constitution, it is concluded that a

fundamental right is established which must be enforced through the provisions of the equal protection clause. I disagree. In *Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273 (1973), the New Jersey court pointed out that such reasoning inevitably leads to a requirement of equal protection for the ownership of property since that also is guaranteed in the constitution. I would doubt that we are now ready, if ever, to adopt such a completely egalitarian concept. By the same parity of reasoning, the guarantee in our constitution of "safety" will require the redesign of the financing systems of county and municipal governments because of varying degrees of fire and/or police protection afforded residents of different counties or municipalities of the state.

Neither the majority nor the dissent has discussed certain other troublesome aspects of the case. This matter was brought as one for declaratory judgment. In my judgment it has been converted into one of mandate. The defendants are certain state and county officials, all of which are vested with constitutional and statutory duties and authority, none of which encompass authority to restructure the system for financing education in Idaho. Indeed, if any of the defendant officials should fail or refuse to perform the duties incumbent on them by the presently existing statutes, they would be subject to the directions of an extraordinary writ. There is a complete absence of any refusal by any defendant herein to perform any clear ministerial duty. There is a demonstrable inability *as a matter of law* on the part of any of the defendants to comply with what has been required of them by the trial court. This court has repeatedly held that an officer will not be coerced or required to perform an act unless it be a clear legal duty. *Vandenberg v. Welker*, 74 Idaho 508, 264 P.2d

facts of which the members of this court are inescapably aware to justify such a conclusion.

\*　　\*　　\*　　\*　　\*

But since the record does not clearly disclose this inadequacy, I believe that my proper

function as a member of the judiciary is not to convert my personal opinion to a constitutional mandate. 84 Wash.2d at 730, 530 P. 2d at 203.

1029 (1953); Allen v. Smylie, 92 Idaho 846, 452 P.2d 343 (1969); Felton v. Prather, 95 Idaho 280, 506 P.2d 1353 (1973). As clearly recognized by the trial court, it is within the plenary power of the legislature, and the legislature alone, under the provisions of our constitution to restructure the system of financing education within the State of Idaho. Since neither the legislature itself, its officers nor members are parties to this action, I fail to discern how the trial court's judgment can be binding on them.

The trial court rendered judgment in this cause on the basis of a motion for summary judgment. That motion was submitted to the court on the basis of stipulated facts. That stipulation does not contain any agreement that a necessary correlation exists between quality of education and the amount of assessable real property lying within a school district, or for that matter, any correlation between quality of education and the amount of dollars spent per pupil. One of the affidavits accompanying the defendants' motion for summary judgment specifically denies the existence of any such correlation. Nevertheless, the learned trial judge concluded *as a matter of law* that such correlation did and does exist and that therefore the plaintiffs were being denied uniform education contrary to what the legislature is required to provide under our constitution.

I deem that summary judgment upon controverted facts to be error. I also deem such an *a priori* progress to the trial court's finding to be erroneous. Rather obviously the trial court relied upon the approach utilized in Robinson v. Cahill, *supra*. Other courts have refused to utilize such an *a priori* approach. See Northshore School District v. Kinnear, 84 Wash.2d 685, 530 P.2d 178 (1974). Although the decision in Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971) is heavily relied upon, even there the California court refused to affirm an *a priori* approach and remanded the matter for evidence.

I would note that there is continued controversy as to the relationship of quality of education to financing. The dispute still rages and many argue that most of the variation in achievement [as a measure of the quality of education] exists within a school or from school to school within a school district, all of which theoretically are equally funded and therefore there can exist no *absolute* correlation between quality, opportunity and achievement, and different levels of funding. The same controversy exists as close to home as the Boise school district.

I am constrained to observe that in my opinion this case in truth and fact has nothing to do with education, the quality or lack thereof, or the inequality of educational opportunity as between school children in Idaho. It was not alleged or proven by plaintiffs that their children are denied any educational opportunity. It was not alleged, proven, or argued that the educational quality available to plaintiffs' children was any less than that of any other child in the state. Conspicuous in this regard is the lack of any such finding by the trial court.

The argument of plaintiffs is solely that the district in which they reside has less assessable property than other districts and therefore higher local ad valorem taxes must be levied to support the educational system within their district. It is oversimplistic to argue that each child in Idaho should have the same amount of money spent on its education as does every other child. Plaintiffs themselves readily admit that such complete uniformity is undesirable, if not impossible, to obtain. They point out the desirability of spending different sums on pupils at primary levels as contrasted with those at secondary levels; spending different sums on handicapped, exceptional, disadvantaged and special situation children as contrasted with a normal or average child (whatever those terms may mean); spending more for a child which has transportation problems as contrasted with one who does not;

spending different sums of money for children desirous or needful of special curriculum by way of vocational training or other needs as contrasted with normal academic oriented programs.

All of these differences result in inequality of expenditures from pupil to pupil, all are present in the existing scheme of financing, and plaintiffs are candid in admitting their existence, and what is more important, demanding that these inequalities be continued. Thus it is my opinion that this case does not involve uniformity and/or equality of expenditure of money per pupil throughout the State of Idaho but rather it is an attempt to obtain uniformity of taxation of real property in the various school districts throughout the state.

Setting aside all the above problems, the quintessence of the trial court's decision is the necessity for a relatively equal dollar amount expenditure per pupil across the State of Idaho. The court found "dollar input per pupil is plainly relevant and the court has been shown no other viable criterion for measuring compliance with the mandate of article 9, section 1." Plaintiffs are therefore forced to contend that they may have their arguments both ways, i. e., that there be mandated a financing system in Idaho in which all children of school age have substantially the same amount of dollars assigned to and expended upon their education and at the same time that fiscal uniformity or equality per pupil is undesirable and unobtainable.

The "problem" in Idaho, as seen by the plaintiffs, is solely related to the money available for education purposes from real property tax sources in one district as contrasted with others. The distribution of moneys by the State under the legislative formula is based on factors plainly designed to accomplish inequality of expenditures per pupil across the State of Idaho. Of these factors and inequalities, plaintiffs do not complain except as they tend to exacerbate the fundamental "problem"

of unequal assessed valuation from one school district to another.

Justice Donaldson, in his dissenting opinion, chides the majority for failing to set out a standard or test by which compliance with the constitution can be measured. I suggest the same criticism may be leveled at the dissenting opinion and the judgment of the trial court. The only standard utilized by the trial court is expenditure per pupil, a standard which is repudiated by plaintiffs. By what standard then is the present or any future system of financing education to be judged? How may the legislature determine if a proposed new financing system is offensive to the constitution without a standard? No such standards have been articulated by the parties either here or in the lower court and we know of no decision by any other court in any other jurisdiction which has done so. I respectfully suggest that a decision condemning a present system serves no purpose unless it promulgates a standard and examines viable alternatives.

Albeit the reapportionment cases were decided under the federal constitution, they brought about large and sweeping changes in sociological and governmental concepts. They too were concerned with uniformity and equality. Those changes however were mandated in a context with standards and legislative guidelines clearly enunciated. See Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964) and Robert B. McKay, Reapportionment, (1965).

If we are to say, as did the trial court, that the legislature has failed to comply with its constitutional mandate and that its efforts in devising a system for the financing of education in Idaho have been irrational or unreasonable, I suggest we should examine what the legislature could or should have done or should do in the future.

The legislature, as a practical matter, could take the moneys available at the state level for common schools and divide it into equal portions for each school district.

It is conceded that such distribution would not be desirable nor ameliorate the fiscal problems of education in this state. There is no argument but that the legislature from a practical standpoint could allot the moneys available at the state level for common schools to each school district in the state on the basis of the number of pupils therein. It also appears to be conceded that such a distribution would fail to alleviate the fiscal needs of education in the state since it would ignore the many factors which everyone, including the plaintiffs herein, agree require differing amounts of money to be spent on different types of pupils and which is contemplated in the present legislative system of ADA and WADA factors.

Inferentially at least, it is suggested that in the area of the presently existing school districts and their ability to raise taxes from real property exists the opportunity and need for change. Exactly how that change is to be accomplished is not articulated either here or below. Perhaps the entire state should be redesigned with new school districts, each of which would have a reasonably identical amount of taxable property valuation within its boundaries. Idaho's widely and wildly divergent geography, land values, assessment practices, concentration or sparsity of student population, differences in the "mix" of students, difficult and at times impossible transportation, varying degrees and amounts of bonded indebtedness, almost dictate that the presently existing "problem" would be replaced with another of weirdly gerrymandered districts requiring extensive relocation and construction of physical plants, more extensive transportation of students, more rigid state control of local assessment practices, chaos in the area of bonded indebtedness and almost certainly a depreciation of educational quality. An additional factor which would have of necessity to be contained in any equation for change is our state's non-taxable land resulting from the checkerboarded government ownership of approximately 70 to 75% of the total land area of the state.

Another alternative might be the abolition of all local funding of our educational system and the assumption of all educational funding at the state level. If all funding were to come from the state, local control of the schools would disappear. To argue that funding would come from one source and control from another is to ignore practical reality. *Cf.* Education Commission of the States, Compact, April, 1975.

One may have certain reservations concerning the continued validity of the basic educational philosophy expressed in Andrus v. Hill, 73 Idaho 196, 249 P.2d 205 (1952), when measured by today's standards and demands. Nevertheless the desirability of continued local control of the common schools is at least arguable. Questions such as the scholastic use of physical plants on a year-round basis through the use of staggered scheduling or longer daily staggered hours of class to the end that more students may be accommodated in one plant; desired or necessary curriculum expansion or contraction; the usage of visual and other teaching aids; the size of athletic and other extra-curricular programs and the funding therefor; the design, structure and furnishing of buildings; such mundane matters as to the desirability of air-conditioning or carpeting in schools; all are questions which require answers and not merely discussion. Arguments erupt at the drop of a hat as to what is or is not necessary in an educational system, what is or is not a frill, what does or does not detract from the quality of education, what reduces available money and time of students, both of which could better be devoted to more orthodox academic education. What some denominate frills are asserted by others as necessary to the full-rounded education experience and enrichment of the future life of our children.

The major policy question involved is whether local people whose children will attend the schools should make those sort of decisions through their elected boards and, what is perhaps more important, back up their decisions with the imposition of taxes upon themselves to pay for such pro-

grams. On the other hand, should those types of decisions emanate from non-personally involved people at a state level. I make no pretense of possessing the wisdom necessary to furnish a definitive answer to the basic question of state versus local control. I doubt that any of my brethren on this bench make any such pretense.

The most important question, however, to be resolved if funding were to take place at the state level is determining the level at which funding per student should be set statewide. I would have to assume that if the legislature were to embark upon such a complete state funding it would arrive at a "uniform" figure per pupil somewhere near the present average, mean or median expenditure per pupil in the state. Obviously all pupils presently funded at the higher level would have their quality of education decreased [assuming the trial court to be correct in its finding of a necessary relation between funding and quality]. This is a result for which plaintiffs do not argue and inferentially at least their position is to the contrary. Such a statewide funding solution would also ignore the presently existing bonded indebtedness of the various school districts and somehow would require the assumption of that indebtedness by the state posing questions of constitutional validity. A necessary ingredient of any such plan would be the total prohibition of any local funds being used to enrich or amplify the state funded program. Otherwise the enrichment of the state program would again bring about the very lack of "uniformity" of which plaintiffs complain.

There may be other possible alternatives but none have as yet been suggested. In my judgment they would probably include some of the undesirable results suggested above and for some children in the state the quality of their education would decline. Again, in my judgment, no scheme for uniformity can be devised by any person no matter how well intentioned 'which will divide up the responsibility of funding of education within the State of Idaho

without the consideration of one absolute, i. e., how much money should be expended per pupil on a statewide basis. The problem becomes nearly insuperable in view of plaintiffs' argument that we must continue to be unequal in certain facets of our educational system, depending upon the different needs of individual children.

The most fundamental questions at this point appear to be: How much faster can we go in achieving an ideal in the financing of education; how much financial inequality from pupil to pupil is necessary because of the varying needs of those individual pupils; what is the minimum or maximum per average pupil financial expenditure to be; are school districts in the name of uniformity to be prohibited from enriching a basic state-financed program; and is local autonomy and control of the schools in Idaho to disappear?

I suggest that the answers to such questions must come from the legislative branch of government. It may be no better equipped to grapple with and solve those problems than is this court. They have been attempting over the years to better the system of education in this state. Perhaps it is those actions over the past years that we should examine as a basis for our determination if their attempts to better the financial system have been arbitrary, capricious, illogical and detrimental to the school children of Idaho.

It is beyond argument that not too many years ago the common school education system in Idaho was in many respects substandard. In too many places it was characterized by the one-room schoolhouse with outdoor privies and other undesirable aspects. Sparsity of student population within some of the then existing school districts, together with limited finances, made difficult the employment of competent teachers, restricted the curriculum offerings and made transportation nightmarish. Many of the then existing school districts were unrealistic in terms of numbers of children within the district, the amount of assessable real property contained in the

district and/or the ability of the district to finance an education for their children.

In the years 1946–47 there were 1,082 school districts within the State of Idaho. Biennial Report, State Board of Education, 1948–50. In 1947 and again in 1963 the legislature acted to require consolidation of the school districts in Idaho. I.C. § 33–501 et seq., I.C. § 33–310 et seq. By requiring the then existing school districts to consolidate, it was hoped to eliminate substandard education and upgrade educational opportunity for the school children in Idaho. At the present time school districts have been consolidated and reorganized and reduced in numbers to 115 districts.

We should perhaps examine the track record of the legislature to determine whether or not "there has been entirely too much deliberation and not enough speed" (Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 [1964]). In 1910 state funds derived from a chainstore tax, a beer tax, and land endowment earnings were appropriated in the amount of $228,558.31 for the support of common schools in the state. By 1934 that amount had grown to $709,562.67. Biennial Report, State Board of Education, 1929–30, 1935–36. In 1939 the first moneys were appropriated by the legislature from the state general fund to the public school income fund in the amount of $2,000,000 for a two year period. S.L.1939, Ch. 173, § 1. Most recently the 1975 legislature has allocated (S.L.1975, Ch. 104) $118,046,500 in state funds to the support of the common schools for a one year period. Additionally, that same legislature (Ch. 144, 215, S.L.1975) has allocated an estimated $12,000,000 of state funds to the various counties for deposit in the county school funds for the purpose of reducing ad valorem taxation in the counties.

The above discussion indicates that there is little continued validity of the trial court's findings regarding the relative percentages and amounts of money used to finance education in Idaho from state, county and school district sources.

In my opinion the actions of the legislature in recent years for financing education in Idaho have been taken with a view to the retention of the maximum amount of local autonomy and control, and an attempt to upgrade education in the state. Those actions should not be surprising in view of the mandate set down by this Court in the case of Andrus v. Hill, *supra*. Legislators, being mortal, usually fall short of perfection. The obtention of perfection in governmental affairs is impossible, in part, because of the ebb and flow of political forces, differing individual concepts of perfection and the reality of taxing the public in one form or another for the cost of all governmental activities. I make no pretense of omniscience and concede that the resolution of socio-politico-educational policy decisions lie outside the ambit of our constitutional authority and within that of the legislature. I find no gross neglect on the part of the legislature in attempting to perform its constitutional duty in the field of education.

McFADDEN, J., concurs.

DONALDSON, Justice (dissenting).

The majority of the Court holds that the present public elementary and secondary school financing system meets the requirements of the Idaho Constitution. I must dissent from that holding.

The analysis of the majority is prefaced with the disclaimer that the Court would be performing as a "super-legislature" should it enter the "controversial area of public school financing." I agree that the Court must limit itself to those activities within its proper scope of inquiry. However, the legislature is not omnipotent. By its nature, the Idaho Constitution limits, rather than grants, the powers of the legislature. Leonardson v. Moon, 92 Idaho 796, 451 P.2d 542 (1969). This Court has the burden of determining when those limi-

tations are violated. The presence of controversy must not prevent the Court from meeting its obligations to the people of the State of Idaho.

For the reasons set forth below, I find that the public school financing system of the State of Idaho as enacted by the legislature results in an unconstitutional denial of equal protection of the laws as guaranteed by Article I, Section 2, of the Idaho Constitution. The majority agrees with the district court's conclusion as to the equal protection issue, yet rejects that court's finding as to the correlation between funding and educational opportunity. However, I disagree with the lower court's conclusion on the equal protection issue and find merit in the finding as to funding. Therefore, I will discuss my position first in regard to the decision of the trial court, then in regard to that of the majority.

### I.

The trial court concluded that the present system of financing the public elementary and secondary schools of this state violated the constitutional requirements of equal educational opportunity for all of Idaho's school children. This requirement is found in Article IX, Section 1, of the Idaho Constitution which reads as follows:

"The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools."

The trial court ruled that a system which results in a wide variance in the sums available to the various school districts for the education of their children cannot stand.[1]

I agree that the present system does not meet the standards of the Idaho Constitution. However, the full intent of Article IX, Section 1, is realized only when coupled with Article I, Section 2, commonly called the equal protection clause. That section reads as follows:

"All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the legislature."

The combination of these two sections of the Idaho Constitution requires restructuring of the public school financing system. It is from this point that I disagree with the analysis of the district court.

The district court held that the present system does not deny the plaintiffs equal protection of the laws of Idaho. With this the majority agrees. As authority the lower court cited *Rodriguez* and *Robinson*. The *Rodriguez* case involved the school financing system of Texas, which is much like Idaho's, and its constitutionality as tested against the equal protection clause of the Fourteenth Amendment to the United States Constitution. The three-judge panel of the Federal District Court, W. D. Texas, San Antonio Division, found that the Texas system created classifications on the "suspect" basis of wealth, thereby violating the federal equal protection clause since the state could demonstrate no "compelling interest" in the classification. Rodriguez v. San Antonio Independent School Distict, 337 F.Supp. 280 (1971).

---

1. The district court based its conclusion on the findings of fact set forth in majority opinion. The majority does not feel itself bound by those findings because they are based on documentary rather than testamentary evidence. The record indicates that the method of presentation was chosen to save time. Rather than run a series of experts through the court to testify as to the statistics and theories, the lower court elected to have the evidence submitted in exhibit form. I believe the findings of fact are supported by the evidence even without the presumptions normally afforded findings by the lower courts. However, one must wonder what effect the majority's off-handed rejection of the findings will have on future attempts at court efficiency.

On appeal the United States Supreme Court, through Justice Powell, held by a 5 to 4 vote that the Texas financing system did not violate the equal protection clause of the Fourteenth Amendment. The majority dismissed the "suspect classification" problem by finding no discrimination against a definable class of poor people. The court then addressed the issue of whether education was a fundamental constitutional right, thus demanding strict scrutiny of any infringement thereof. To summarize briefly, the court first found that the United States Constitution does not explicitly or implicitly guarantee a citizen's right to an education, thus rejecting the fundamental right argument. The court then found that the Texas system was supported by a legitimate and reasonable basis, that being primarily the local input on matters of taxation, fiscal planning, and educational policy. Moreover, the court determined that the Texas system established an adequate minimal educational opportunity through state funds, with local funds enriching the program when possible. With that the court, while admitting that it is far from ideal, let the Texas financing system stand.

The *Robinson* case involved an attack upon the constitutionality of the New Jersey school financing system. The Supreme Court of that state rejected any claims under the equal protection clause of the New Jersey Constitution. That court found a violation of a particular clause of the New Jersey Constitution requiring that the state establish and maintain a "thorough and efficient" system of public schools. New Jersey Const.1947, Art. VII, § I, par. 1. In coming to that conclusion, the court rejected the plaintiff's equal protection claim of a denial of a fundamental right with the position that finding education to be a fundamental right would possibly result in other governmental services being found to be in the position of protection. The court outlined its fear of upsetting the present system of New Jersey which funds many programs, such as the county courts, through locally determined and collected property taxes, and thus interfering with the local control over such programs. Finally that court interjects that it is quite possible that the state's interest in local government would be a "compelling interest."

I find the authority offered by the trial court and relied upon by the majority less than persuasive. *The Rodriguez* decision is, of course, the final determination of the federal equal protection clause. The United States Supreme Court provides the ultimate definitions of the United States Constitution. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). However, the question before us is involved with the Idaho Constitution, not that of the United States. In such a case it is this Court that has the duty of interpretation. As a result, the influence of *Rodriguez* on the case before us is only that of the persuasion its logic can muster. We have held that the equal protection clause of the Idaho Constitution is substantially equivalent in construction to the federal clause. State v. Cantrell, 94 Idaho 653, 496 P.2d 276 (1972); Weller v. Hopper, 85 Idaho 386, 379 P.2d 792 (1963). But this is not to say it is equivalent in ultimate result.

As noted above, the *Robinson* case turned on a particular clause in the New Jersey Constitution. Of course such constitutional construction involves consideration of not only the language of the document itself but also the general circumstances at the time of the drafting of the document. Toncray v. Budge, 14 Idaho 621, 95 P. 26 (1908). Thus the New Jersey court had one set of facts to consider while we have another. While I find merit in certain aspects of the *Robinson* opinion, I must nevertheless conclude that the Idaho Constitution and the circumstances surrounding its adoption lead to a different result.

## II.

The majority acknowledges that the Idaho Constitution guarantees our citizens equal protection and benefit of the government of the State of Idaho. The question before the Court is whether that guarantee requires revision of the system now used to finance our public schools. The threshold issue is what is the proper test to apply to equal protection problems.

## A.

The respondents contend that education is a "fundamental right" guaranteed to the citizens of Idaho. Because of this right an infringement by the state will be allowed only upon a showing by the state of a "compelling interest" in continuing the infringement.

The majority rejects any application of the two tier test as discussed in Rodriguez, *supra*. They take the two fold approach that (1) the strict scrutiny test is a hopelessly mechanical test ill-suited to complex analysis [2] and (2) Idaho has never adopted the test. Several interesting cases involving topics as diverse as liquor licenses and the guest statute are offered as authority for the position that Idaho has not utilized the two tiered test. These cases only establish that our state has utilized the rational basis test. Nowhere in the authority is a holding rejecting the utilization of the strict scrutiny test. It is my position that this Court has adopted the so-called two tiered test as to alleged denials of equal protection of the laws as guaranteed by the Idaho Constitution.

The test was described by this Court in Thompson v. Hagan, 96 Idaho 19, 523 P.2d 1365 (1974), as follows:

"To determine whether a statutory classification scheme violates the equal protection guarantee, the United States Supreme Court has followed a two tier test. If the classification involves a fundamental right such as the right to vote, or if the classification involves a suspect classification such as race, it has been held that the state bears a heavy burden to justify the classification distinctions. The analysis for fundamental rights and suspect classifications is called the strict scrutiny test. In all other areas of the law such as social welfare legislation, a restrained standard of review is applied. [footnotes omitted]" 523 P.2d 1365, 1367.

*See also* State v. Cantrell, *supra*, footnote 9 at 655, 496 P.2d at 278.

Arguably, this was *dicta*. However, the test was expressly utilized in State v. O'Bryan, 96 Idaho 548, 531 P.2d 1193 (1975). Therein, in answer to appellant's claim of a denial of equal protection under both the Idaho Constitution and the United States Constitution, we held that there is no fundamental right to smoke marijuana. This was necessary to the ultimate holding of the opinion and was not *dicta*. Therefore, while the majority proclaims that they must refuse to analyze the issues under the strict scrutiny test, it is my position that the parties are entitled to such analysis.

In *Rodriguez* Justice Powell in speaking for the majority defines fundamental right as follows:

"[T]he key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution. [Citations omitted]" 411 U.S. 1, 33, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16.

By applying this rather narrow test, the majority held that education is not a

---

2. In passing I note that the majority neglects to explain how the well-established "rational basis" test is any less mechanical, thus acceptable.

fundamental right guaranteed by the United States Constitution.

An eloquent dissent filed by Justice Marshall argues that fundamental rights need not be so narrowly tested, but rather must be determined by importance. The degree of that importance in large part is determined by the interrelationship between the infringed activity and those rights expressly guaranteed by the Constitutional provision. Since, as Justice Marshall continues, an education is necessary to exercise fully many of those rights already held to be fundamental, any infringement on a citizen's education itself should be held under strict scrutiny.

Because the case before us meets either of the two tests of a fundamental right, it is not necessary to select between them. As both Justice Powell and Justice Marshall indicate, the equal protection clauses do not themselves generate substantive rights, but rather serve as enforcers either of rights delineated elsewhere in the respective organic documents (Powell's position) or of rights necessary to enjoy fundamental rights (Marshall's position). A synthesis of the two positions indicates that an express guarantee of a right would establish a fundamental right. The Idaho Constitution contains an entire Article dealing solely with education in this state. My reading of Article IX of the Idaho Constitution leads me to the conclusion that education is expressly guaranteed by that provision and is therefore a fundamental right in the State of Idaho.

Primary analysis must be directed to the first section of the Article.[3] Interpretation of this section will determine the extent of the constitutional guarantee. To determine the intent of the framers of the Idaho Constitution it is necessary to look at both the language of the document and the circumstances surrounding its framing.

## B.

Since Article IX expressly establishes education as a fundamental individual right, the next step is to ascertain the nature of that guarantee and its effect on the financing system.

The existence of the Article indicates that the delegates to the Constitution Convention of 1889 held both a strong belief in the importance of education and a belief that the state must establish and maintain a system to provide that education.

A major inducement to applying for statehood was the offer of the federal government to grant to the new states lands to be used only for the support of the public schools. The state would be granted sections 16 and 36 of every township in the state, and could do with the lands what it wanted so long as the funds were used to support the public schools. During the Constitution Convention many hours of debate were directed to the issue of whether lands so granted should be sold, leased, or offered to the public through some combination of the two. Although the issue was approached from many different avenues, one uniting factor stood out. Notwithstanding the position taken by the respective delegates on whether to sell or lease the school lands, all the delegates sought to avoid financing the school system through local direct taxation. The problem of maintaining the school fund was prominent in the delegates' deliberations partially because of the experience of the neighboring State of Oregon wherein, according to the delegates, the school lands had been "frittered away" which resulted in "calling upon the people for direct taxation for money for educational purposes."[4]

Delegate McConnell, who was a proponent of selling the school lands, stated his position as follows:

"Mr. Chairman, I think no fund is more sacred than the school fund, and perhaps

---

3. That constitutional provision is set forth in section I of this dissent.

4. Proceedings of the Idaho Constitutional Convention of 1889, at 650 (I. W. Hart ed.

1912). The two volume publication will hereinafter be referred to as "Constitution Proceedings."

there is no other fund so sacred; it should be guarded in every manner possible, and by having this provision in here, the children will always be made sure there will be that much money to their credit, and we will have that much at stake in our schools. But if there is no provision for making this fund good in every way, it may be squandered, and *the first thing we know our school fund will be so small that we can only maintain the schools by local taxation.* I think the legislature can provide for making good any losses which may occur. They will probably be more careful in making investments if it is known that the state has to make it good." 1 Constitution Proceedings 647. (emphasis added)

Delegate Parker favored leasing the lands but underscored the common aversion to local direct taxes when he stated the following:

"A stable republican form of government depends upon our education interests. We recognize it here by incorporating that in our Section 1 of this article. Congress has recognized it by making this grant of land embracing two sections in every township and additional grants for university purposes. Now I hold that congress gave us these lands not for ourselves, but for our children and our children's children and for generations of posterity yet unborn. Let us hold on to them, and as our territory develops these lands will increase in value and *we shall be able to get money for school purposes without calling upon the people for direct taxation for money for educational purposes, as they have to do in our neighboring commonwealth of Oregon today.*" 1 Constitution Proceedings 649. (emphasis added)

The specific resolution of the question of whether to sell or lease the lands is not vital to our considerations. The important factor to derive from the debate is that the solution was intended to prevent local direct taxation for the financing of schools, thereby avoiding a reliance on local wealth.

Thus, my examination of the Idaho Constitution and the proceedings prior to its adoption leads to the conclusion that education is a fundamental right in Idaho and the framers of the Constitution intended that right to be fulfilled by the state without undue reliance on local taxable wealth.

III.

The respondents contend that the present public school financing system infringes on their fundamental right to an education. This is due, respondents continue, to the varying sums of money available to the districts throughout the state. The variance is caused by the difference in the assessed valuation of the districts and the ad valorem property taxes applied thereto.

It is clear that regional variances were not within the intentions of the framers of the Constitution. The constitutional proceedings reveal the egalitarianism that was an essential motivation in the formation of our state. Article after Article in the Constitution itself indicates the feeling of equality that permeated the populace.[5] This notion is also evident in the debates leading up to the framing of the Constitution. Delegate Poe expressed the hope that the state would have a school fund "which will not only educate the present generation, but as it goes on it will educate those who come after us." 1 Constitution Proceedings 658. Delegate Parker stated that, "our school system is a foremost necessity

5. This is best illustrated by the opening declaration of the Constitution, Article I, § 1, which reads as follows: "All men are by nature free and equal, and have certain inalienable rights, among which are enjoying and defending life and liberty; acquiring, possessing and protecting property; pursuing happiness and securing safety."

in this whole undeveloped territory of Idaho." 1 Constitution Proceedings 649. Delegate Parker, we note, spoke of the "whole territory," not just the Southeastern section or the Northern section.

Although not within the intentions of those statesmen, regional variations have indeed come about. The district court's Findings of Fact illustrate the variations as follows:

| School District | Assessed valuation per Ada | | Total Mill levy | |
|---|---|---|---|---|
| | 1970–71 | (1972–73) | 1970–71 | (1972–73) |
| Pocatello | $3,593 | ($4,138) [6] | 63.00 | (69.2) [7] |
| Meridian | 4,646 | ( 4,825) | 45.00 | (62.5) |
| Blackfoot | 4,119 | ( 4,350) | 43.6 | (44.6) |
| Caldwell | 3,640 | ( 4,450) | 49.5 | (56.2) |
| Moscow | 5,759 | ( 6,974) | 64.1 | (75.7) |
| Bonner | 6,588 | ( 7,038) | 49.2 | (53 ) |
| Kellogg | 10,433 | ( 7,566) | 52.7 | (67.1) |
| Boise | 5,194 | ( 6,362) | 74.6 | (78 ) |

It is necessary to note also that the trial court's example omits certain readily available extremes. An inclusion of the wealthiest district (Three Creek Elementary: $120,118 with 19.1 mills) and the poorest (Post Falls: $2,880 with 57.8 mills) would amplify the example. The trial court selection does illustrate very well the situation in the larger districts.

The crucial question is whether these variations and the resulting differences in expenditure levels per student result in unequal educational opportunities. In other words, does the quality of education a district offers vary with the monies expended by the district.

The district court concluded that dollar input does indeed affect the quality of the educational opportunity offered by a district. The conclusion is stated as follows:

"In providing state aid on the basis of formulas designed to ameliorate in part the dollar disparities generated by a system of local taxation, the *Legislature has acted on the premise that there is a significant connection between the sums expended for education* and the quality of the educational opportunity. Hence, the Court must and does accept the proposition that such a connection does exist and that the quality of educational opportunity does depend in substantial measure upon the number of dollars invested, notwithstanding that the impact upon students may be unequal because of other factors, natural or environmental, which play a part. Thus, dollar input per pupil is plainly relevant and the Court has been shown no other viable criterion for measuring compliance with the mandate of Article IX, Sec. 1." (emphasis added)

The conclusion illustrates the Court's reliance on the actions of the Legislature acknowledging the nexus between dollar input and qualitative output.

The statements made during oral arguments indicate that the trial court desired to avoid a lengthy and costly trial, the sole purpose of which would be to present expert testimony relating to the relationship of expenditures and quality of opportunity. This is in marked contrast to the trial court

6. Financial Summaries, Idaho School Districts, School Year 1972–73. State Dept. of Education, Exhibit L.

7. Tabulation of Tax Levies, School year 1972–73, State Dept. of Education, Exhibit O.

in Serrano v. Priest [8] which, upon remand, held 62 court days devoted primarily to testimony as to the relationship now in question. However, both trial courts arrived at the same conclusion. A significant initial problem before the *Serrano* trial court, and indeed any trial court facing this general issue, was the selection of a proper standard for measuring the quality of education. That trial court rejected the pupil-achievement standard and adopted a school-district offerings standard. Upon that standard the California trial court found as follows:

> "The evidence is overwhelming that the wide disparities in expenditure levels between low-wealth school districts and high-wealth school districts, which will be continued for years under SB 90 and AB 1267, have significant adverse effects on the quality of the educational programs and opportunities afforded the children in the low-wealth school districts compared with the quality of educational programs and opportunities afforded the children in the high-wealth school districts." Memorandum Opinion, at p. 100.

That court then listed certain advantages enjoyed by the wealthier districts.[9]

In Robinson v. Cahill, *supra*, the New Jersey Court was also faced with this issue and, while arriving at a different ultimate result, agreed with the position adopted by both the *Serrano* courts and our trial court of the Fourth Judicial District. The New Jersey Court stated their conclusion as follows:

> "There was testimony with respect to the correlation between dollar input per pupil and the end product of the educational process. Obviously equality of dollar input will not assure equality in educational results. There are individual and group disadvantages which play a part. Local conditions, too, are telling, for example, insofar as they attract or repel teachers who are free to choose one community rather than another. But it is nonetheless clear that there is a significant connection between the sums expended and the quality of the educational opportunity. And of course the Legislature has acted upon that premise in providing State aid on formulas designed to ameliorate in part the dollar disparities generated by a system of local taxation. Hence we accept the proposition that the quality of educational opportunity does depend in substantial measure upon the number of dollars invested, notwithstanding that the impact upon students may be unequal because of other factors, natural or environmental." 303 A.2d 273, 277 (1973).

The majority believes that a sizable controversy exists among the nation's educators on this point. The catalyst of the present discussion is the Coleman Report.[10] Dr. Coleman's general position is summarized by his statement that, "* * *

---

8. The California Supreme Court in Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971) held that a summary judgment directed against plaintiffs in a position similar to that of the Thompsons was improperly granted, and remanded the case for trial. The trial court subsequently released a lengthy opinion which is cited Serrano v. Priest, Superior Court, Los Angeles County, California, No. 938254, Memorandum Opinion Re Intended Decision.

9. This is as follows (also at p. 100): "It is an inescapable fact that * * * the high-wealth school districts, with far greater funds available per pupil than are available to the low-wealth school districts, have the distinct advantages of being able to pay for, and select the better-trained, better educated and more experienced teachers the ability to

maintain smaller class sizes by employing more teachers, the ability to offer a wider selection of courses per day, the ability to provide better and a greater variety of supportive services such as more counselors and teachers aides, the ability to obtain the latest and best educational materials and equipment, and the ability to keep the educational plants in tip-top shape. These are the kinds of items that go into the making of a high-quality educational program that benefits the children of a school district that has a relatively high level of expenditures flowing from high assessed valuations of property."

10. This is the popular name for "Equality of Education Opportunity" which is a 1966 report for the Office of Education U. S. Department of Health Education and Welfare.

schools brings little influence to bear on a child's achievement that is independent of his background and general social context." Coleman Report, at 325. This report was greeted with both applause and disapproval. Several educational institutions initiated studies designed to recheck the Coleman conclusions, and, of course, the academic infighting continues. Yet even the strongest advocates of Coleman's position have not declared that expenditures have no effect on a child's education. Moreover, it is yet to be expresseed by anyone that increased expenditures are deleterious to a child's education. While the social scientists debate the priorities of corrective action, the courts [11] have concluded that expenditures have at least some effect on the quality of a child's educational opportunity.[12]

The majority offers certain authority rejecting the notion that expenditures have an impact upon educational quality. Yet, as I set forth above, several other courts have acknowledged the relationship, and reasonably so. The logic is overwhelming. As noted by the majority in citing the case of Andrus v. Hill, *supra,* the legislature originally adopted the Foundation Program because "it appeared desirable to make changes in order to secure more nearly equal educational opportunities to the children in the different districts." This Court in *Andrus* found that to be a laudable goal. At the center of that legislative action is the recognition that sound educational programs are centered on adequate funding. What other basis could there have been for the adoption by our legislature, and, as the record indicates, the legislatures of 48 other states, of the initial equalization plan?

For the reasons set forth by the courts cited above, I believe that a school district's expenditures play a significant role in determining the quality of that district's educational opportunity. Clearly a school district would have a great deal of difficulty offering a competent chemistry program if it were unable to purchase the proper equipment and materials. Yet a wealthy district would have little trouble offering such a program. Thus, certain children would be denied and others offered the program with no basis for such differentiation other than fortuitous geographic location.[13] Because the variations in available funds of necessity place limitations on the educational options available to the less wealthy districts,[14] the students in those districts

11. I. e., *Serrano, supra; Robinson, supra;* and the trial court in *Thompson, supra.*

12. For the further discussion of the Coleman Report, *see* 71 Colum.L.Rev. 1378–88 (1971).

13. Of course this is an extreme example chosen to illustrate the issue and should not be taken as a criticism of those school districts which are unable to provide certain programs.

14. The trial court constructed the comparison below to illustrate the variations in fund raising ability. The hypothetical districts closely approximate the situation within the state.

"Illustration 4 shows the disparity of money available per child in three hypothetical districts—one 'poor', one average for Idaho, and one 'rich', in terms of assessed valuation per pupil—using a State Average Cost per Student of $330, which approximates the actual factor for 1970–71.

| District | A | B | C |
|---|---|---|---|
| Assessed valuation per pupil | $3,000 | $5,750 | $12,000 |
| 22 mills times assessed valuation | 66 | 126 | 264 |
| State and County Foundation Allowance | 264 | 204 | 66 |
| 'State Average Cost per Student' | 330 | 330 | 330 |
| Unequalized M & O taxes | | | |
| 8 mills (30 Mill 'Limit' minus 22)* | 24 | 46 | 96 |
| 5 mill 'override' | 15 | 29 | 60 |
| Total M & O funds per weighted pupil in ADA if districts levied 35 mills | 369 | 405 | 486 |
| 10 mills for bonding and plant facilities | 30 | 58 | 120 |
| | $ 399 | $ 463 | $ 606" |

* Subsequent to the trial court's finding the mill unit was changed from 30 to 27.

are not afforded an educational opportunity equal to that enjoyed by the students residing in the wealthier districts.

Therefore, I would find that the present public school financing system infringes on the fundamental right of Idaho citizens to an equal and uniform educational opportunity.

## IV. .

A recurrent position throughout both the appellants' argument and the majority opinion is that the present system, with its heavy reliance on locally established mill levies, is valid because it promotes local control of the schools. This is the primary notion contained in the quote from Andrus v. Hill, *supra,* which the majority offers as proof of a "rational basis" for the system.

The systems of public elementary and secondary education in Idaho and her sister states do indeed evidence a common desire to put the decision making processes as closely as possible to the people. That is why the system composed of local school boards with elected trustees is so widely utilized. This local control concept has been advanced at times as being a "compelling governmental interest." We readily acknowledge that the best government is that that is closest to the people. However, the local control argument is not relevant to the issue of financing.

The argument generally posits that the local electorate is able to determine through the periodic mill levies the amount they wish to spend on the education of their children. As we discussed in the previous section, the expenditure levels determine in part the quality of the educational opportunity available to the students. The argument then concludes that the will of the citizens within the district must be left undisturbed, hence the financing system must not be amended.

I reject this argument simply because it assumes the availability of legitimate options to all the school districts. This assumption is false. As the data set forth in this opinion illustrate, the poorer districts in the state cannot reach the funding levels of the wealthier districts without applying totally unreasonable mill levies beyond the means of the average citizen. Without funds to support them, optional programs simply are not within the reach of the poorer districts. These districts are locked into a struggle to provide as best they can the basics of an education. This contrasts sharply with the wide and varied curricula available to students of the wealthier districts at little expense to the local citizens. This occurs not because the parents of the children in the district with the low tax base are unwilling to provide additional funds for the schools, but rather because the present funding system precludes any viable options. Thus, I find "local control" not to be an applicable goal in regard to the financing of the public school system in Idaho.[15]

This is not to say that local control over other matters is not an important aspect of our system of government. Local control over such matters as course offerings beyond those prescribed by the appellant State Board of Education provides the flexibility and opportunity for experimentation that are essential to the vitality of our form of government. In Idaho the public elementary and secondary schools are organized under 115 school districts, each one under the direction of locally elected school board trustees. These boards have long been recognized as an integral segment of our state government,[16] and perform the vital job of getting government as closely as possible to the people. The discretion exercised by these boards on certain matters adds immeasurably to the quality of education received by their children.

---

15. This point is explained very well by Justice White in his dissent in *Rodriguez, supra,* 411 U.S. at 66, 93 S.Ct. 1278.

16. Common School Dist. No. 61 v. Twin Falls Bank and Trust Co., 50 Idaho 711, 4 P.2d 342 (1931).

However, this appeal is not directed toward such concerns, but instead is focused only upon the system of funding that has been established by the legislature. Local control is hindered rather than protected by the present system. Local control is valueless without funds to explore viable options. I find no positive connection between the present system of public school financing and the desirable notion of local control.

## V.

It is necessary to discuss certain other issues involved in the majority opinion. The appellants contend that the word "uniform" in Article IX, Section 1, requires only " * * * that every school shall provide a basic educational curriculum which, when successfully completed, will add to or provide that student with sufficient tools of intelligence and training to permit that student to play a part in providing for the stability of a republican form of government." Appellants' brief, p. 13. The majority has, in essence, bought that argument.

After rejecting any application of the equal protection clause, the majority focuses on an interpretation of Article IX. On one hand, they declare that the legislature must establish and maintain a uniform and thorough statewide system of education. On the other hand, they state that the legislature has the duty of funding at least a portion of the school system.[17] They then proceed to hold that this mandatory intermediate funding level is somehow adequate.

The problem with this position is twofold. By announcing a requirement of partial funding by the state, the majority posits that the legislature's duty to establish and maintain a uniform system of education goes beyond merely setting up an apparatus upon which the local districts may finance their schools. The state must provide both an organizational outline and some funding to flesh out that outline. While declaring that some funding by the state is mandated by the Constitution, the majority fails to set out a standard or test by which compliance can be measured. What is the level of funding required of the state? Is one dollar enough? Or does forty million dollars meet the requirement? We are left to wonder by the majority. The second part of the problem, assuming *arguendo* that the majority had some sort of test in mind, is that the record contains no evidence as to the results obtained from the present level of state funding. There is nothing to show whether the state is meeting the mandate one must infer from the majority's requirement of partial state funding. I would think the majority is at least obligated to remand the case to the district court for findings of fact as to the educational results obtained by the present level of state funding.

Moreover, I disagree with the majority's position for a second reason. An underlying justification for the majority's position is that of some minimal level of benefits. This parallels the discussion in *Rodriguez* of the "floor" established by the funds provided by the Texas legislature. I cite with approval Justice Marshall's dissent in *Rodriguez,* wherein he criticized that notion as follows:

"[T]his Court has never suggested that because some 'adequate' level of benefits is provided to all discrimination in the provision of services is therefore constitutionally excusable. The Equal Protection Clause is not addressed to the minimal sufficiency but rather to the unjustifiable inequalities of state action. It mandates nothing less than that 'all persons similarly circumstanced shall be treated alike.' F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920)." 411 U.S. 1, 89, 93 S.Ct. 1278, 1325.

17. One wonders at this requirement if it were valid to state that there is no correlation between expenditures and educational quality.

It is my position that under the present funding structure all students similarly situated are not treated alike.

## VI.

The education of the children of this state is among the highest of our responsibilities as citizens, parents, and public officials. This is evidenced by our Constitution, our statutes, and the active participation by many of our citizens in the educational process.

The framers of our Constitution devoted an entire Article of that document to the education of our children. This, I believe, is an express guarantee of a fundamental right as discussed by Justice Powell in *Rodriguez*. This is the crucial difference between the challenge to the Texas system and the challenge before this Court. In conjunction with the guarantee of a uniform and thorough education, the citizens of our state are also guaranteed equal protection of our laws. It is this framework of analysis that demands revision of the funding system.

This position is premised on my belief that there is a positive correlation between expenditures and educational opportunity. As set forth above, several courts have concurred in this. Moreover, the manner in which the present system is utilized indicates that it is beyond doubt that funding levels have an effect upon the results achieved by the educational system. As noted above in the discussion of *Andrus*, the legislature initially adopted the Foundation Program as a means of increasing the funds available to the districts in order to reduce the inequities in opportunity. In addition to the state funds available to them, every district taxes the property of its patrons to provide additional funds. In most cases the levies require, and receive, approval by ballot of the electors of the district. By voicing approval for

increased expenditure levels, the voters are acknowledging the relationship of funds to opportunity.[18] They do not tax themselves because they enjoy decreasing their disposable income. They do so because it is apparent to them that dollars are a necessary component of the education formula. Yet the majority states that it has not been proven to their satisfaction that discrepencies in funds per ADA will lead to discrepencies in educational opportunity.

The tragedy of the present system is illustrated by the district court's hypothetical example set out in Footnote 14. Those voters in the districts that are "poor" in taxable land value, while acknowledging the need for funds for the schools, must apply unrealistically high mill levies to approach the revenue available to "richer" school districts at much lower levies. Thus, the children of the state are forced to play a geographic lottery.

The respondents' goal is fiscal neutrality, educational opportunity not being a function of local district wealth.[19] I believe this is mandated by our Constitution. The trial court stated that the state may recognize differences in educational costs that are based on relevant economic and educational factors. I agree. In a state as geographically and demographically diverse as ours, clearly certain differences are found. Courses that are of great value to students in metropolitan areas may be of little interest to students in rural areas. The opposite may also be true. Thus, differing course offerings would in certain instances be proper. Elements of the Foundation Program such as the sparsity factor, and the additional allocation for the education of handicapped children are also legitimate acknowledgements of these differences.

The problem lies not with these variations, but with the variations in the most

---

18. They are also expressing the notion that the funds provided by the state are far from sufficient for the "maintenance" of the school system.

19. *See* Coons, Clune, Sugarman, Educational Opportunity: A Workable Constitutional Test for State Financial Structures, 57 Calif. L.Rev. 305 (1969).

basic of concerns, fund raising ability. The poorer districts have long labored under the burden of the present system. That burden has in turn worked an unconstitutional infringement upon the fundamental right to an equal educational opportunity as guaranteed by the Idaho Constitution.

In refusing to declare these variations to be unconstitutional infringements of that right, the majority cites several cases to the point of the legislature's plenary power in establishing and maintaining the school system. I agree that such is the decree of the Idaho Constitution. Yet, as I noted above it is the duty of this Court to enforce the limitations imposed by that document upon the legislature. Constitutionality of a particular statutory scheme is not established merely by the longevity of the program. Caesar v. Williams, *supra.*

Both the appellants and the majority note the social upheaval that may result from *Serrano,* its progeny, and the case now before us. The appellants compare this with the effects of Brown v. The Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962). I recognize that my position in this case would necessitate great revision in the present system of financing the public secondary and elementary schools. However, language in *Brown* explains why this step is necessary. In speaking for the court, Justice Warren stated as follows:[20]

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is

required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." 347 U.S. 483, 493, 74 S.Ct. 686, 691.

It is this importance that mandates revision. The Idaho Constitution requires that the Legislature establish and maintain a uniform system of free public elementary and secondary schools. I believe that the history and legal precedents of our state require that such a system be one free of a substantial dependence upon the variable taxable wealth of 115 distinct school districts. A system of financing in which the educational opportunity per student varies as significantly as in this state does not meet the constitutional requirement.[21]

The nature of this right to an education was well described in the writings of Horace Mann. These writings were adopted by the California Supreme Court in *Serrano* as follows:

"By our holding today we further the cherished idea of American education that in a democratic society free public schools shall make available to all children equally the abundant gifts of learning. This was the credo of Horace Mann, which has been the heritage and the inspiration of this country. 'I be-

---

20. This of course is offered not as specific authority, but rather to emphasize the importance of education in todays society.

21. The trial court found that operating expenditures per student in 1970–71 varied in

the 115 school districts from $428 to over $4,000 with a state average of $553. Exhibit L indicates that the 1972–73 figures ranged from $483 to $2,332, with an average of $637.

lieve,' he wrote, 'in the existence of a great, immortal immutable principle of natural law, or natural ethics,—a principle antecedent to all human institutions, and incapable of being abrogated by any ordinance of man \* \* \* which proves the *absolute right* to an education of every human being that comes into the world, and which, of course, proves the correlative duty of every government to see that the means of that education are provided for all. \* \* \*' (Original italics.) (Old South Leaflets V, No. 109 (1846) pp. 177–180 (Tenth Annual Report to Mass. State Bd. of Ed.), quoted in Readings in American Education (1963 Lucio ed.) p. 336)" 96 Cal.Rptr. 601, 626, 487 P.2d 1241, 1266.

I believe that the present system does not fulfill the constitutional obilgation the State of Idaho owes its people.

Therefore, I dissent from the majority opinion.

BAKES, J., concurs with dissent.